RECORD NO. 19-2075

*In The*

# United States Court of Appeals
### For The Fourth Circuit

## WILLIAM D. CARMACK,

*Plaintiff – Appellant,*

**v.**

## COMMONWEALTH OF VIRGINIA; COMMONWEALTH OF VIRGINIA, SOUTHWEST VIRGINIA HIGHER EDUCATION CENTER; DAVID N. MATLOCK, Director of the Southwest Virginia Higher Education Center, in His Individual and Official Capacities,

*Defendants – Appellees.*

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF VIRGINIA AT ABINGDON

―――――――――

## BRIEF OF APPELLANT

―――――――――

Terry N. Grimes
TERRY N. GRIMES, ESQ., PC
320 Elm Avenue, SW
Roanoke, Virginia 24016
(540) 982-3711

Brittany M. Haddox
STRELKA LAW OFFICE, PC
119 Norfolk Avenue, SW, Suite 330
Roanoke, Virginia 24011
(540) 283-0802

*Counsel for Appellant*

*Counsel for Appellant*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No.  19-2075       Caption:  William D. Carmack v. Commonwealth of Virginia, et al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

William D. Carmack
(name of party/amicus)

who is _____appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?    ☐ YES ☑ NO
       If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO
       If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(a)(2)(B))? ☐ YES ☑ NO If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐ YES ☑ NO If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    ☐ YES ☑ NO If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/ Terry N. Grimes                        Date:    10/15/2019

Counsel for: William D. Carmack

## CERTIFICATE OF SERVICE
**************************

I certify that on     10/15/2019     the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

/s/ Terry N. Grimes                        10/15/2019
        (signature)                              (date)

- 2 -

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................ ii

JURISDICTIONAL STATEMENT ...................................................1

STATEMENT OF THE ISSUES ........................................................1

STATEMENT OF THE CASE .............................................................2

SUMMARY OF ARGUMENT ..................................................... 14

STANDARD OF REVIEW ........................................................... 15

ARGUMENT ................................................................................ 16

      1.    Motion to Strike ............................................. 16

      2.    Summary Judgment ........................................ 21

CONCLUSION ............................................................................ 27

REQUEST FOR ORAL ARGUMENT ...................................... 27

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Aetna Ins. Co. v. Boon*,
    95 U.S. 117 (1877) ................................................................ 25

*Beale v. Jones*,
    210 Va. 519, 171 S.E.2d 851 (1970) .................................. 23

*Beasley v. Bosschermuller*,
    206 Va. 360, 143 S.E.2d 881 (1965) .................................. 25

*Bentley v. Felts*,
    248 Va. 117, 445 S.E.2d 131 (1994) .................................. 25

*Black v. TIC Investment Corp.*,
    900 F.2d 112 (7th Cir. 1990) .............................................. 20

*Buser v. So. Food Serv., Inc.*,
    73 F. Supp. 2d 556 (M.D.N.C. 1999) ................................. 20

*Center Dev. Venture v. Kinney Shoe Corp.*,
    757 F. Supp. 34 (E.D. Wis. 1991) ...................................... 20

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
    401 U.S. 402, 91 S. Ct. 814, 28 L. Ed. 2d 136 (1971) ...................... 19

*Cont'l Tire North Am., Inc. v. Transp. Solutions, Inc.*,
    2007 U.S. Dist. LEXIS 89066 (W.D.N.C. Dec. 4, 2007) ................. 20

*Educ. Media Co. at Va. Tech, Inc. v. Insley*,
    731 F.3d 291 (4th Cir. 2013) .............................................. 15

*Erie R.R. Co. v. Tompkins*,
    304 U.S. 64 (1938) ................................................. 14, 21

*Etheridge v. Norfolk S.R.R.*,
143 Va. 789, 129 S.E. 680 (1925) ...................................................... 24

*Farmer's Adm'x. v. Chesapeake & O. Ry.*,
144 Va. 65, 131 S.E. 334 (1926) ........................................................ 25

*Huffman v. Sorenson*,
194 Va. 932, 76 S.E.2d 183 (1953) .................................................... 23

*McDonnell Douglas v. Green*,
411 U.S. 792 (1973) ........................................................ 14, 21, 23, 25

*McGinnis v. Southeast Anesthesia Assocs., P.A.*,
161 F.R.D. 41, 1995 U.S. Dist. LEXIS 5047 (W.D.N.C. 1995) ..... 19-20

*Melendez v. Bd. of Educ.*,
711 F. App'x 685 (4th Cir. 2017) ....................................................... 15

*Passaro v. Virginia*,
935 F.3d 243 (4th Cir. 2019) .............................................................. 25

*Penguin Restoration, Inc. v. Nationwide Mut. Ins., Co.*,
2014 U.S. Dist. LEXIS 22836 (E.D.N.C. Feb. 21, 2014) .................. 20

*Reeves v. Sanders Plumbing Products, Inc.*,
530 U.S. 133 (2000) .................................................................... 15, 18

*S & C Co. v. Horne*,
218 Va. 124, 235 S.E.2d 456 (1977) .................................................. 23

*Schools v. Walker*,
187 Va. 619, 47 S.E.2d 418 (1948) .................................................... 24

*Scott v. Simms*,
188 Va. 808, 51 S.E. 250 (1949) ........................................................ 23

*Tolan v. Cotton*,
134 S. Ct. 1861 (2014) ....................................................................... 15

iii

*United States v. Duke Energy Corp.*,
    218 F.R.D. 468 (M.D.N.C. 2003)........................................ 20

*United States v. Little*,
    52 F.3d 495 (4th Cir. 1995) ...................................... 14, 21

*United States v. Witmer*,
    835 F. Supp. 201 (M.D. Pa. 1993) .................................. 20

*Von Roy v. Whitescarver*,
    197 Va. 384, 89 S.E.2d 346 (1955) ................................. 24

## CONSTITUTIONAL PROVISION

U.S. Const. amend. I................................................... 14

## STATUTES

28 U.S.C. § 1291.......................................................1

28 U.S.C. § 1367...................................................... 21

Va. Code Ann. §§ 2.2-3009, *et seq.*............................ 1, 14, 22

Va. Code Ann. § 2.2-3010(B)........................................... 22

Va. Code Ann. § 2.2-3011(A)........................................... 22

## RULES

Fed. R. App. P. 4(a)(1)(A)..............................................1

Fed. R. Civ. P. 6(c)(2) ............................................... 19

Fed. R. Civ. P. 37(c) ................................................. 19

## JURISDICTIONAL STATEMENT

On May 30, 2018, William D. Carmack filed suit against the Commonwealth of Virginia in the Circuit Court for the County of Washington in Abingdon, Virginia for violation of the Virginia Fraud and Abuse Whistle Blower Protection Act, Va. Code §§ 2.2-3009, *et seq.* (1950), amended, arising out of the termination of his employment as the Chief Financial Officer (CFO) of the Southwest Virginia Higher Education Center.  On July 6, 2018, the Commonwealth removed the case to the United States District Court for the Western District of Virginia (JA 6-15).  Carmack appeals the district court's August 29, 2019 order granting the Commonwealth's motion for summary judgment (JA 2263).  This Court has jurisdiction pursuant to 28 U.S.C. § 1291, which provides that "[t]he courts of appeals … shall have jurisdiction of appeals from all final decisions of the district courts of the United States."  Carmack timely filed a notice of appeal on September 27, 2019 (JA 2264-2265).  *See* Fed. R. App. P. 4(a)(1)(A).

## STATEMENT OF THE ISSUES

(1)    Did the district court err by denying Appellant's motion to strike defense declaration?

(2)    Did the district court err by granting the Commonwealth's motion for summary judgment, including erring by relying on discovery

produced by Appellee after discovery closed and by failing to decide the state

whistleblower claim under state law?

## STATEMENT OF THE CASE

Carmack began working as Chief Financial Officer of the Southwest

Virginia Higher Education Center ("the Center") in Abingdon, Virginia in

2012 (JA 574).  The Center "is the first multi-college and university institution

of higher education in the Commonwealth.  Established as a State Agency in

1991, the Higher Education Center partners with public and private colleges

and universities to provide degree programs, certificates, and professional

development courses" https://www.swcenter.edu/about-us/ (last visited

February 11, 2020).

Approximately a year after Carmack's employment began, the Center's

executive director, Rachel Fowlkes, "created a Foundation for the purpose of

obtaining research and development grants through the Tobacco Commission,

and also for the purpose of obtaining federal grants … that would offer

training programs in southwest Virginia" (JA 564).  Thus, the Foundation

exists "to raise funds" for the Center and "[t]o support the activities of the

Southwest Virginia Higher Education Center" (JA 1195).

About a year later, "the Attorney General's office [Elizabeth Griffin]

came to Dr. Fowlkes and asked that the … Foundation be operationally split

from the Center" (JA 577).  Griffin asked Carmack to serve as the CEO of the

Foundation and establish a system whereby the Center was reimbursed by the

Foundation for the time that Carmack spent on Foundation work (*Id.*) — to be

clear, the Foundation exists only to support the Center, but the state required

that the entities maintain separate financial records.[1]  The amount of

reimbursement varied from year to year with the Foundation reimbursing the

Center for 15 to 25 percent of Carmack's salary (JA 578, 594).  Thus, the

funding for Carmack's position came from three sources: money raised by the

Foundation, non-general funds (*i.e.*, money raised by the Center (the Center

rents space for events, among many other things, to generate income)), and

general funds provided by the Commonwealth (JA 1231).  All employees

were paid both by general funds and non-general funds, and some employees

such as Alicia Young and Carmack had some of their salary paid by the

Foundation (JA 1397 (two months of pay for all employees was paid by non-

general funds); JA 1481-1498 (Matlock paid by general and non-general

funds); (JA 817) (Young paid in part by Foundation)).

After Fowlkes retired June 30, 2015 (JA 597, 631), Carmack served as

Interim Executive Director from July 10 to October 15, 2015 when David

---

[1] When Carmack's employment with the Center ended, he also ceased serving
as the Foundation's CEO, though no official action was taken to remove him
from that position (JA 820) as Matlock had no authority to remove Carmack
as the CEO (JA 1234).

Matlock was hired as the new Executive Director (JA 604-611, 631-632). During one of their first meetings in November 2015, Carmack updated Matlock on Center finances and "reminded him that I operated by the rules … and that we were very careful to operate the Center according to – it's called CAPPs.  It stands for the Commonwealth Accounting Policies and Procedures.  Those are the guidelines under which UVA and the Commonwealth operate from an audit perspective" (JA 639).

This did not sit well with Matlock.  Matlock immediately made clear that he did not care for state rules or financial oversight and asked "if I knew what needling meant, and I said I did not" (*Id.*) Matlock then "proceeded to tell [Carmack] that needling was when a mother bird built a nest, and she put sharp objects pointing upwards.  After the birds were hatched, she would begin to take threads of that nest loose, leaving the sharp prongs, which incentivized the birds to leave the nest.  And that that was the method that he used to get people off the team that he did not want" (*Id.*).

About this time, Joyce Brooks, Center Human Resources, told Matlock that she planned to retire (JA 649-650).  Knowing this, in December 2015 Matlock  moved Adam Tolbert from his computer job in Information Technology (IT) to "shadow Ms. Brooks or train for her position" in HR (JA 650; *see also* JA 1272-1273 (Tolbert had no HR experience, only IT

experience); JA 1061, 1289 (Tolbert given raise)). This violated state policy (JA 650-651). Carmack therefore reminded Matlock in December 2015 that "pre-selection at UVA [(UVA provided HR oversight to the Center)] is an issue," that Matlock was required "to follow the policies and procedures;" "you can't just put someone in that job" (JA 651).

Again, this did not sit well with Matlock. Matlock ignored Carmack and state policy and proceeded to do what he wanted. In addition to the pre-selection issue, several IT employees, including Nick Rahley and Austin Dierks, approached Carmack in early 2016 and expressed concern that their co-worker in the next cubicle had access to their evaluations and salaries as Matlock had given Tolbert, in IT, full access to all senior level management HR information held by Brooks (*Id.*). This also violated state policy.

About the same time, in early 2016 Carmack "noticed that policies and procedures that were in place at UVA concerning hiring, accounts payable, accounts receivable, were not being followed" (JA 648-649). Carmack again cautioned Matlock that the Center must follow state policy (JA 649). For example, in violation of state policy Matlock paid state funds, including substantial overtime pay, to a husband and wife, Barry and Elizabeth Tate, for work that was never done. Matlock took this action despite the fact that Carmack had raised the issue with Matlock several times and despite Carmack

5

having secured a bid to get the job done in a timely manner, which the Tates had not done, at $50,000 less than what the Tates were paid  (JA 668-670; JA 671-673 (Tates agreed to have the program done in 6 months; two years later it was not complete; Elizabeth Tate admitted she did not have the knowledge to do the job, and relied on Barry Tate, who had a fulltime job at Crutchfield Corporation, to do the work)).  As Carmack testified, this was a clear "fraud and abuse" of state funds (JA 679), and Carmack had complained to both Jeff Webb and Matlock about the matter (JA 81-82, ¶14(b); JA 1718).

Then in January of 2016, Carmack tried to meet with Matlock to discuss the budget process for the next fiscal year.  Matlock was not interested. Instead, Matlock went around Carmack and said that he would contact Chris Fields, who at the time worked for Virginia Highlands Community College, a separate agency; Fields had previously handled the finances for the Center and had not worked there for four (4) years (JA 649).

Matlock also hired a longtime friend, Joe Mitchell, to work as the maintenance supervisor without having been interviewed by a selection committee as required by state policy; again, Carmack drew the violation to Matlock's attention, to no avail (JA 695-698; JA 1456; *see also* JA 1002-1003, JA 1065-1068).

Matlock also ordered the removal of a $9,900 piece of artwork which had been dedicated to the previous Executive Director. The artwork mysteriously disappeared and remained missing for over a year. After Carmack filed suit, the artwork reappeared and was reinstalled (JA 684-688; JA 1081-1082; JA 846-847; JA 1226-1228; JA 905).

Matlock also failed to submit invoices in a timely manner as required by state policy. Carmack spoke to Matlock about this as well (JA 666-667).

Matlock also used state funds to favor his family. Matlock's son worked as a local middle school principal. Matlock used Center funds to send students from his son's school and no other school to a robotics competition (JA 690-694; JA 1346 (Matlock failed to provide requested documentation to the Office of the State Inspector General to show that other schools had been offered a similar opportunity)). And in any event, the Center existed to support higher education, not elementary and middle education.[2]

Next, often when Matlock was involved with a fundraising event, money wound up missing. For example, Matlock's involvement with a local songwriting festival, the Richard Leigh Songwriter Festival, resulted in money missing (JA 679-680). Then, six months later, when Matlock tried to host his own Richard Leigh festival, those proceeds never showed up at all

---

[2] The Center had previously paid to send adults to a STEM program but had never paid for children to attend programs (JA 690-691).

(JA 680; JA 841-842). Similarly, Matlock held a golf tournament fundraiser, which Matlock planned with no financial oversight from the Center's finance department. Again, money went missing. The Center was never able to balance the income and expenses for the event (JA 683, 685-686; JA 836-840; JA 1546).

Carmack complained repeatedly about mismanagement to Matlock, to no avail. As the frequency and severity of Matlock's improprieties increased (JA 661-662), Carmack approached the ombudsman at the University of Virginia in February 2017 to seek direction (JA 657, 662). After hearing what was happening at the Center, the ombudsman immediately called the Commonwealth's Department of Human Resource Management (DHRM) in Richmond and asked if they could meet with Carmack the next morning (JA 657-658). Carmack thereafter travelled to Richmond and met with DHRM (JA 658). The acting director of DHRM directed Carmack to report the matter to the Commonwealth's Office of State Inspector General (OSIG) (*Id.*).[3] "[A]nd so in June I had no other choice, and upon recommendation of five individuals at the State, I filed a complaint" with OSIG (JA 657; *see also* JA 1547; JA 1548-1678 (OSIG file)).

---

[3] Carmack also spoke with the Secretary of Higher Education, Dietre Trent's, office about the matter (JA 660).

Carmack told OSIG that the complaint need not remain confidential because Matlock would know who made the complaint — Carmack had complained repeatedly to Matlock about the same issues since 2015 (JA 1545). Carmack did express concern to OSIG that Matlock would retaliate; thus, OSIG offered to notify Carmack before it spoke with Matlock (JA 1718). OSIG notified Carmack that it intended to speak with Matlock on October 16, 2017 (*Id.*).

Matlock's response was swift and sure. That same day, Matlock called his lieutenants, Kathy Heitala, Jeff Webb, Joyce Brooks, and Adam Tolbert into his office and slammed the door (JA 1718; *see also* JA 1083-1084 (Brooks recalled this meeting and suspected it was Carmack who made the OSIG complaint); JA 1321 (Matlock claims he had "suspicions" it was Carmack when the inspector called him)). And, it was common knowledge at the Center that Carmack had made the complaint; thus, Carmack was excluded from the meetings concerning the complaint,

> Q   The meeting in October of 2017 with David Matlock, Kathy Hietala, Jeff Webb, and Adam Tolbert, Mr. Carmack was not there, was he?
> A   I don't recall. If we were meeting on the OSIG investigation, I don't think he was ever present in any of those meetings.

(JA 1084-1085). And, it was clear that Carmack was regarded negatively as a result of his complaint,

> Q    Did you think that Duffy was trying to cause trouble?
> A    Yes.
> Q    When did you purpose in your mind that Duffy was trying
> to cause trouble?
> A    With the OSIG investigation.  And I was brought in and
> informed of it by David because my name came up.
> Q    And you thought, based upon that, that it was Duffy trying
> to cause trouble, correct?
> A    Based on the insinuations that were being levied.

(JA 1087; *see also id.* (Brooks admitting that the allegation involving her,

though, was true)).

Carmack was further ostracized because of the complaints.  Before

Matlock learned of Carmack's complaint in October 2017, each department

manager had a weekly meeting with Matlock (JA 1719).  After Matlock

learned of Carmack's complaint in October 2017, he stopped meeting with

Carmack (*Id.*).  Then, in October 2017, Carmack's emails to Senior Assistant

Attorney General Elizabeth Griffin were blocked (JA 728-731).  Carmack was

also cut off from the Virginia Department of Planning and Budget, an integral

part of his job (JA 734-735).

On November 1, 2017, Matlock then reached out to HR Donna

Kauffman and asked if they were ready to go to the next level with the

Workforce Transition Act to eliminate Carmack's position (JA 1691). Then,

OSIG investigator Tim Sadler sent Matlock a draft of his findings on

November 8, 2017 and noted that some of the complaints were founded (JA 1685-1690).

Then on December 7, 2017, Carmack wrote a letter to the Board of Trustees again attempting to bring to light and correct Matlock's actions (JA 751-753; JA 1500-1501).  On December 14, 2017, Board Member Steve Cochran attempted to go into Executive Session to discuss Carmack's December 7, 2017 letter; but, Senator Carrico prevented it on the advice of deputy AG Elizabeth Griffin (JA 754-759).  During the same meeting, Matlock stated that Center revenue was up, with a total gain of nearly $510,000, and that there were six (6) positions being advertised at the time (JA 1466, 1467-1468).

Three weeks later, on January 4, 2018, Matlock informed Carmack[4] that his job was "eliminated" due to a budget shortfall (JA 732).[5]  At deposition,

---

[4] Matlock did not have to get approval from anyone to hire or fire at the Center (JA 1236).  Matlock claims he received the Executive Committee's blessing; but it was done in closed session so there is no proof of this, and at the same meeting Matlock was given a 3% raise (JA 1714).  In any event, the Executive Committee knew of Carmack's complaints, so even if they were involved in "approving" the termination, it changes nothing (JA 1404, "Matlock shared with Senator Charles William Carrico, the Chairman of the Board, and with Kauffman the existence of the Hotline complaint").

[5] Interestingly, Matlock almost immediately thereafter sent a FOIA request to obtain the entire OSIG file (JA 1696; JA 1350).

however, Matlock conceded that the Center had nearly a million dollars on hand at the time,

> Q   At the time Duffy Carmack's employment ended, the Center had about how much money available?   And don't put any qualifiers on the money.  Just call it money.
> A   800, $900,000 in nongeneral revenue.
> Q   That was my question.  8 or $900,000, correct?
> A   Right.

(JA 1391).

When Carmack was fired, Matlock "detained [the staff] in [a] room for an hour and a half to two hours" and walked Carmack out with an armed guard (JA 832, 860). The Board was not notified of the termination until *after* Carmack was fired (JA 1708; JA 1695; Marcia Gilliam had no prior knowledge (JA 1115)).[6]   And there is no question that Matlock targeted Carmack for termination.  Matlock plainly stated that he planned to "pull the trigger on Duffy" (JA 1734) and no one else — thus providing direct evidence of Matlock's discriminatory *animus*.

Afterward, some Board members were outraged that Carmack had been terminated (*E.g.*, JA 1709-1713)[7]   Board member Cheryl Carrico properly

---

[6] Senator Carrico also withheld for several weeks a letter from Carmack to the Board concerning what had occurred (JA 1708; JA 1679-1681).

[7] Carmack was well-respected as the CFO (JA 1136; JA 831-832).

> Q    Did you tell him that his work was impeccable?
> A    Maybe.

(JA 1369).

observed that the CFO position was "essential to the Center's business" (JA 1712; JA 657). Board Member Steve Cochran even told Matlock that firing Carmack gave him grounds for a retaliation lawsuit (JA 1710; JA 653-655).

*After* discovery closed, the Commonwealth produced two memoranda from then Governor McAuliffe's office calling for a 5% budget reduction across state agencies, excluding institutes of higher learning (JA 2007-2009; JA 2023-2026; *see also* JA 2042-2058, 2083-2084), and, then, in a 19-page litigation affidavit prepared by the AG's office, Matlock claimed that "Carmack was not terminated. Rather, his position was eliminated due to the budget reduction mandated by Governor McAuliffe" (JA 138, ¶ 67). The district court denied the motion to strike the untimely discovery and the litigation affidavit (JA 2173-2177) but did permit Carmack to redepose Matlock (JA 2178-2186). During that second deposition, Matlock backed away from the memoranda and his own litigation affidavit and conceded that the budget reduction memos played at most a "*small part* … [a] *very small*" part in Matlock's decision to terminate Carmack (JA 1936 [Emphasis added]).

Further detailing of facts is reserved for argument.

## SUMMARY OF ARGUMENT

This appeal presents a novel question under a Virginia statute, the Fraud and Abuse Whistle Blower Protection Act ("FWA"), Va. Code Ann. §§ 2.2-3009, *et seq.*[8]  After properly ruling early on that the *Erie* doctrine requires that "'[i]n adjudicating non-federal questions, a federal court must apply the law of the state,'" (JA 65 (quoting *United States v. Little*, 52 F.3d 495, 498 (4th Cir. 1995) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938)))), and denying a motion to dismiss with respect to the FWA claim, the district court inexplicably reversed course on summary judgment and applied federal law — and in particular *McDonnell Douglas v. Green*, 411 U.S. 792 (1973) — to conclude that the evidence was insufficient to submit the case to a jury under *McDonell Douglas* and accordingly awarded summary judgment to the state (JA 2223-2225).  That ruling is error.

Moreover, the district court granted summary judgment based on memoranda that the Commonwealth claimed was *the* reason why it terminated Carmack's employment yet failed to produce until *after* discovery closed, and the district court granted summary judgment based on a litigation affidavit from an individual that Appellant was never permitted to depose because Appellant did not know of this individual's relevant knowledge until after

---

[8] Carmack is not pursuing on appeal the district court's ruling with respect to the First Amendment claim.

discovery closed due to the Commonwealth's failure to produce the aforementioned memoranda during discovery. The district court's reliance on this documentation, and the district court's endorsement of the Commonwealth sandbagging Carmack in this manner, is reversible error, as well.

## STANDARD OF REVIEW

An appellate court reviews "a district court order granting summary judgment *de novo*, viewing the evidence in the light most favorable to the non-moving party." *Educ. Media Co. at Va. Tech, Inc. v. Insley*, 731 F.3d 291, 297 (4th Cir. 2013) (citation omitted). Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanders Plumbing Products, Inc.*, 530 U.S. 133, 151 (2000) (citation omitted); *see also Tolan v. Cotton*, 134 S. Ct. 1861, 1867-68 (reversing summary judgment where "the court below credited the evidence of the party seeking summary judgment and failed properly to acknowledge key evidence offered by the party opposing that motion").

An appellate court reviews a district court's denial of a motion to strike for abuse of discretion. *Melendez v. Bd. of Educ.*, 711 F. App'x 685, 686 n.1 (4th Cir. 2017).

15

## ARGUMENT

### 1.    Motion to Strike

The Commonwealth produced and filed *for the first time*, *after discovery closed* — with its brief in support of its motion for summary judgment — memoranda that it claimed was the reason why it terminated Carmack's employment (JA 2007-2009; JA 2023-2026).   Thereafter, the district court granted Appellant's motion for sanctions, in part, and ordered additional discovery concerning the new memoranda and an additional round of briefing for summary judgment, to both parties, based on the failure by the Commonwealth to produce during discovery what the Commonwealth claimed was critical evidence.   However, the district court only permitted Appellant to take the deposition of the person who appeared by the face of the memoranda to be the author of the memoranda, Paul Reagan; during Reagan's deposition, though, Appellant learned that the true author of the memoranda was Michael Maul, but it was too late — the district court did not permit Appellant to depose Maul.   Had the Commonwealth not withheld the memoranda that it claimed in its summary judgment brief was **the** reason Carmack was fired until *after* the close of discovery, Appellant would have deposed Reagan while discovery was open and learned that Maul was the true source of the memoranda, and then Appellant would have deposed Maul as

well as other employees of the Department of Planning and Budget based on this information.  Instead, Appellant was deprived of the opportunity to depose critical witnesses, including the individual who was the true author of what the Commonwealth called critical evidence.

Thereafter, in the Commonwealth's third and final summary judgment brief that it was permitted to file, the Commonwealth submitted yet another litigation affidavit by the true author of the memoranda — Michael Maul. And, Maul's declaration was critical because during the additional round of discovery, David Matlock strayed from the script that was presented with the Commonwealth's first summary judgment brief: while the Commonwealth maintained in Matlock's first Attorney General drafted affidavit (JA 126-127) and in its first round of briefing (Docket No. 64) that these memoranda were the reason Carmack's employment was terminated, when redeposed without his Attorney General drafted affidavit (the script) in front of him, Matlock conceded that the budget reduction memos played at most a "*small part* … [a] *very small*" part in Matlock's decision to terminate Carmack (JA 1936 [Emphasis added]) — thereby gutting the Commonwealth's defense.  Thus, Maul's second declaration, drafted by the Attorney General's office, was

17

submitted to try to smooth over this vast discrepancy.[9]  The Commonwealth relied heavily on Maul's declaration on brief (see, Docket No. 102, at pages 15-22).  And the Commonwealth conceded on brief that the context of the evidence introduced through Maul did not become apparent until *after* Reagan was deposed, "Reagan identified Michael Maul as the person higher education centers such as the Center would turn to with questions regarding the budget reductions" (Docket No. 102, at page 17); "Reagan testified that he 'would rely on the input and guidance that Michael Maul would provide … extensively'" (Docket No. 102, at page 17).

Appellant, therefore, moved to strike the second affidavit of Maul and the related argument because Maul provided new information to which Appellant had no opportunity to respond (JA 2173-2177), and the information was, according to the Commonwealth, critical summary judgment evidence (JA 2178-2186).  In so doing the district court did exactly what the Commonwealth asked it to do: it granted summary judgment based on the

---

[9] Thus, under our jurisprudence, for this additional reason, summary judgment should have been denied and the question presented to a jury. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000) ("the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose. Such an inference is consistent with the general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as 'affirmative evidence of guilt.'").

litigation affidavit (JA 2263). Maul's affidavit should have been struck because had the Commonwealth not withheld the critical memoranda until after discovery closed, Appellant would have in fact had Maul's deposition transcript to submit to the district court, instead of a litigation affidavit drafted by the Attorney General's office being the only evidence in the record from Maul.[10] Appellant did not inadvertently fail to depose Maul; to the contrary, the Commonwealth sandbagged Carmack by failing to produce the Reagan memoranda until *after* discovery closed, and it got away with it. Due process, codified at Fed. R. Civ. P. 37(c), does not permit a party to sandbag a party in this way. The district court should not have permitted the Commonwealth to do so here, either. Sharp practices such as these have no place in federal jurisprudence. And, for this reason, the judgment of the district court should be reversed.

"Any affidavit supporting a motion must be served with the motion." Fed. R. Civ. P. 6(c)(2). Thus, "affidavits [must] be filed simultaneously *with the motion it supports*, affording the opposing party an opportunity to address the motion fully and squarely on its merits." *McGinnis v. Southeast*

---

[10] The Supreme Court has long recognized that litigation affidavits such as these are merely post-hoc rationalizations used to justify a desired result. *E.g.*, *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420, 91 S. Ct. 814, 825, 28 L. Ed. 2d 136, 154 (1971) (criticizing the use of "litigation affidavits … [as] merely post hoc rationalizations").

*Anesthesia Assocs., P.A.*, 161 F.R.D. 41, 42, 1995 U.S. Dist. LEXIS 5047, at

*2 (W.D.N.C. 1995) [Emphasis added].  It is therefore clear that "[t]he Court

has ample authority to strike arguments made for the first time in a reply

brief."  *Penguin Restoration, Inc. v. Nationwide Mut. Ins., Co.*, 2014 U.S.

Dist. LEXIS 22836, 4-5 (E.D.N.C. Feb. 21, 2014) (citing, *e.g.*, *Buser v. So.*

*Food Serv., Inc.*, 73 F. Supp. 2d 556, 568 n.12 (M.D.N.C. 1999) (refusing to

consider arguments made for the first time in a reply brief); *United States v.*

*Duke Energy Corp.*, 218 F.R.D. 468, 472 (M.D.N.C. 2003) (same)).  Further,

it is improper for a party to make new factual assertions in a reply brief

because doing so 'leaves the opposing party no opportunity to respond.'"

*United States v. Witmer*, 835 F. Supp. 201, 204 (M.D. Pa. 1993) (quoting

*Center Dev. Venture v. Kinney Shoe Corp.*, 757 F. Supp. 34, 36 (E.D. Wis.

1991)).  Thus, "[w]here new evidence is presented in a reply to a motion for

summary judgment, the district court should not consider the new evidence

without giving the movant an opportunity to respond."  *Cont'l Tire North Am.,*

*Inc. v. Transp. Solutions, Inc.*, 2007 U.S. Dist. LEXIS 89066, at *20

(W.D.N.C. Dec. 4, 2007) (quoting *Black v. TIC Investment Corp.*, 900 F.2d

112, 116 (7th Cir. 1990)).  The district court, here, engaged in reversible error

in holding otherwise.

### 2.     Summary Judgment

As stated, the district court erred by awarding summary judgment to the Commonwealth in part because the district court decided the causation question under federal law and not state law in contravention of *Erie*.

To begin, the district court properly recognized that this is a case of first impression (*see* JA 67 ("the Supreme Court of Virginia has yet to interpret the Act")). In denying the Commonwealth's motion to dismiss, the district court properly concluded, therefore, that the state Whistle Blower Act claim must be decided under Virginia law,

> "In adjudicating non-federal questions, a federal court must apply the law of the state." *United States v. Little*, 52 F.3d 495, 498 (4th Cir. 1995) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938)). Thus, where, as here, a federal court is hearing a state law claim over which it is exercising supplemental jurisdiction pursuant to 28 U.S. Code § 1367, the court is bound by the state supreme court's interpretation of state law. (citations omitted)

(JA 65).

This ruling, required by *Erie*, therefore, became the law of the case. Perplexingly, however, the district court reversed course on summary judgment and ruled that it would apply "the *McDonnell-Douglas* framework … in the present matter" (JA 2225). For more than 30 pages in its opinion (JA 2224-2255), the district court then applied *McDonnell-Douglas* and progeny to conclude as matter of law that the evidence failed to raise a

question of fact as to whether the termination of Carmack's employment "was

causally related to his alleged internal warnings and complaints or external

complaints to the OSIG" (JA 2255).[11]   The district court's failure to decide

the question under Virginia law is error.

The district court properly summarized the Whistle Blower Act in its

opinion,

> In Count I, Carmack asserts that he was terminated in violation
> of Virginia's Fraud and Abuse Whistle Blower Protection Act
> ("FAWBPA"), Va. Code Ann. § 2.2-3009, *et seq*. (1950), after
> reporting multiple instances of alleged wrongdoing and financial
> malfeasance at the Center.  The FAWBPA provides that it is the
> "policy of the Commonwealth that … employees of
> governmental agencies be freely able to report instances of
> wrongdoing or abuse committed by governmental agencies or
> independent contractors of governmental agencies."  Va. Code
> Ann. § 2.2-3009.  In particular, "[n]o employer may discharge,
> threaten, or otherwise discriminate or retaliate against a whistle
> blower whether acting on his own or through a person acting on
> his behalf or under his direction."  *Id.* at § 2.2-3011(A).  In order
> to qualify as a whistle blower, the employee must make a "good
> faith report" of "wrongdoing or abuse" to "one of the employee's
> superiors, an agent of the employer, or an appropriate authority."
> *Id.* at § 2.2-3010(B).

(JA 2219).

---

[11] The district court's reference to "*alleged* internal warnings and complaints"
is curious, as the evidence that Carmack had made internal complaints was
overwhelming and undisputed, and in any event, the district court on summary
judgment should have viewed the evidence in the light most favorable to
Carmack.

But, instead of deciding whether a jury question exists with respect to causation under *McDonnell-Douglas*, the Court should have decided the question under Virginia law.

The law with respect to causation in Virginia is well-established. First, the Supreme Court of Virginia has long recognized the difficulty in defining causation. In *S & C Co. v. Horne*, 218 Va. 124, 128, 235 S.E.2d 456, 459 (1977), for example, the Supreme Court stated that "[p]roximate cause is a concept difficult to define and almost impossible to explain…." And in *Beale v. Jones*, 210 Va. 519, 522, 171 S.E.2d 851, 853 (1970) (citing *Huffman v. Sorenson*, 194 Va. 932, 76 S.E.2d 183 (1953) (other citations omitted)), the Supreme Court of Virginia stated,

> The proximate cause of an event is that act or omission which, in natural and continuous sequence, unbroken by an … intervening cause, produces the event, and without which that event would not have occurred.

And in *Huffman*, the Supreme Court of Virginia stated,

> "There is no yardstick by which every case may be measured and fitted into its proper place. In each case, the problem is to be solved upon mixed considerations of logistic, common sense, justice, policy and precedent."

*Huffman*, 194 Va. at 937, 76 S.E.2d at 187 (quoting *Scott v. Simms*, 188 Va. 808, 816, 51 S.E. 250 (1949)).

23

The Supreme Court of Virginia has also recognized that although "causation" may be difficult to define, the concept is well-established in Virginia law,

> It may readily be conceded that 'proximate cause' is an unsatisfactory phrase…. It has not only troubled the unlearned, but has vexed the erudite. But by its use in unnumbered cases, it has grown to be a part of the livery of the law of negligence and it is now too late to discard it.

*Etheridge v. Norfolk S.R.R.*, 143 Va. 789, 799, 129 S.E. 680, 683 (1925).

Importantly, under Virginia law, proximate cause does not require that the defendant's actions be the sole or only cause of the plaintiff's injury: it is sufficient if the defendant's conduct contributed to the final result. *See, e.g.*, *Von Roy v. Whitescarver*, 197 Va. 384, 89 S.E.2d 346 (1955) (quoting *Schools v. Walker*, 187 Va. 619, 47 S.E.2d 418 (1948)). This means that there may be more than one proximate cause. As the Supreme Court stated in *Etheridge v. Norfolk S. R. Co.*, 143 Va. 789, 799, 129 S.E. 680, 683 (1925),

> Heat, moisture and springtime may stir a dormant bud; each would be a proximate cause, and this would not be changed even though it should appear that they contributed to that result in an unequal decree.

Moreover,

> It is sufficient if it is established that the defendant's act produced or set in motion other agencies, which in turn produced or contributed to the final result.

*Von Roy*, 197 Va. at 393, 89 S.E.2d at 352. In Virginia,

The proximate cause is the efficient cause, the one that necessarily sets the other causes in operation.  The causes that are merely incidental or instruments of a superior or controlling agency are not the proximate causes and the responsible ones, although they may be nearer in time to the result.  It is only when the causes are independent of each other that the nearest is, of course, to be charged with the disaster.

*Farmer's Adm'x. v. Chesapeake & O. Ry.*, 144 Va. 65, 85, 131 S.E. 334, 340 (1926) (quoting *Aetna Ins. Co. v. Boon*, 95 U.S. 117 (1877)).

And under Virginia law, it is well settled that "[p]roximate cause is generally a question of fact for the jury." *Bentley v. Felts*, 248 Va. 117, 120, 445 S.E.2d 131, 133 (1994) (citing *Beasley v. Bosschermuller*, 206 Va. 360, 365-66; 143 S.E.2d 881, 886 (1965) ("it is well settled that negligence, contributory negligence and proximate cause are usually questions for the jury")).

As stated, the district court should have decided the question under Virginia law and not *McDonnell Douglas*.  The analysis could, therefore, end here, and this Court should reverse and remand the case to the district court with instruction to the district court to apply Virginia law to the facts of the case.  And to the extent there is any question about Virginia law as to this point, this Court should certify the question to the Supreme Court of Virginia.  *Passaro v. Virginia*, 935 F.3d 243, 253 (4th Cir. 2019) (Traxler, J., dissenting)

("If new ground is to be plowed, I believe it should be done by the Supreme Court of Virginia.").

Notwithstanding the above, continuing with the argument, the evidence here is more than sufficient to submit the question of causation to the jury under Virginia law.  Without restating the evidence *seriatim*, shortly after Matlock became executive director, Carmack told Matlock plainly that he "operated by the rules … [and] the guidelines under which UVA and the Commonwealth operate" (JA 639).  Matlock responded immediately with the "needling" analogy and targeted Carmack for "removal from the nest" (*Id.*). Carmack thereafter repeatedly complained to Matlock about violations of state policy with respect to hiring and promotions, failure to follow state accounting practices, fraud waste and abuse of state funds, and missing funds, leading Matlock at one point to send an email stating plainly that he intended to "pull the trigger on Duffy" — and no one else (JA 1734).  When nothing changed, Carmack reported his concerns to the ombudsman of the University of Virginia in February 2017, followed by complaints to the Commonwealth's Department of Human Resource Management (DHRM) and OSIG (JA 657-658).  When Matlock learned of the OSIG complaint, he immediately called his confidants into his office and "slammed the door" (JA 1718; JA 1083-1084; JA 1321).  Immediately thereafter, Matlock ostracized Carmack and

stopped meeting with him; his emails to the Deputy Attorney General were blocked; and Carmack's access to the Virginia Department of Planning and Budget, an integral part of his job, was blocked (JA 1719; JA 728-731; JA 734-735). On November 8, 2017, OSIG reported to Matlock that some of Carmack's complaints were founded (JA 1685-1690). On December 7, 2017, Carmack sent a letter to the Board again complaining about Matlock's actions JA 1500-1501. Shortly thereafter, Carmack's employment was terminated on January 4, 2018 (JA 732). As stated, this evidence is more than sufficient to submit the question of causation to the jury under Virginia law.

## CONCLUSION

For the foregoing reasons, Carmack requests that this Court reverse the judgment of the district court and remand the case for further proceedings, or in the alternative, certify the question to the Supreme Court of Virginia.

## REQUEST FOR ORAL ARGUMENT

Carmack requests oral argument.

Respectfully Submitted,

WILLIAM D. CARMACK

By   /s/ *Terry N. Grimes*
         Of Counsel

Terry N. Grimes, Esq. (VSB No. 24127)
TERRY N. GRIMES, ESQ., P.C.
320 Elm Avenue, S.W.
Roanoke, Virginia 24016
TELEPHONE: (540) 982-3711
FACSIMILE: (540) 345-6572
tgrimes@terryngrimes.com
      *Counsel for Plaintiff-Appellant*

Brittany M. Haddox, Esq. (VSB No. 86416)
STRELKA LAW OFFICE, PC
119 Norfolk Avenue, SW
Warehouse Row, Suite 330
Roanoke, Virginia 24011
(540) 283-0802
brittany@strelkalaw.com
      *Counsel for Plaintiff-Appellant*

# CERTIFICATE OF COMPLIANCE

1.      This brief complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

[ X ] this brief contains [*6,056*] words.

[   ] this brief uses a monospaced type and contains [*state the number of*] lines of text.

2.      This brief complies with the typeface and type style requirements because:

[ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 2016*] in [*14pt Times New Roman*]; *or*

[   ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].

Dated:  February 18, 2020                    /s/ *Terry N. Grimes*
                                             *Counsel for Appellant*

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 18th day of February, 2020, I caused this Brief of Appellant and Joint Appendix to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

Ryan S. Hardy
Edwin L. Kincer, Jr.
OFFICE OF THE ATTORNEY GENERAL
202 North Ninth Street
Richmond, Virginia  23219
(804) 786-0969

*Counsel for Appellees*

I further certify that on this 18th day of February, 2020, I caused the required copies of the Brief of Appellant and Joint Appendix to be hand filed with the Clerk of the Court and a copy of the Exhibit Volume of the Joint Appendix to be served, via UPS Ground Transportation, upon counsel for the Appellees, at the above address.

/s/ *Terry N. Grimes*
*Counsel for Appellant*