No. 19–2075

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————————

WILLIAM D. CARMACK,

Plaintiff-Appellant,

v.

COMMONWEALTH OF VIRGINIA; SOUTHWEST VIRGINIA HIGHER
EDUCATION CENTER; DAVID N. MATLOCK,

Defendants-Appellees.

———————————

On Appeal from the United States District Court
for the Western District of Virginia

———————————

**CORRECTED BRIEF OF APPELLEES**

———————————

Ryan S. Hardy
*Assistant Attorney General*
Office of the Attorney General
202 North 9th Street
Richmond, Virginia 23219
(804) 786-0969 - Telephone
(804) 371-2087 - Facsimile
RHardy@oag.state.va.us

E. Lewis Kincer, Jr.
*Senior Assistant Attorney General*
Office of the Attorney General
202 North Ninth Street
Richmond, Virginia 23219
(804) 371-2101 – Telephone
(804) 371–0200 – Facsimile
Ekincerjr@oag.state.va.us

*Counsel for Appellees*

March 16, 2020

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No. __19-2075__    Caption: __William D. Carmack v. Commonwealth of Virginia, et al.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Commonwealth of Virginia, the Southwest Virginia Higher Education Center, David N. Matlock__
(name of party/amicus)

_____

 who is _____appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?    ☐ YES ☑ NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO
      If yes, identify all such owners:

i

4.   Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?   ☐ YES ☑ NO
If yes, identify entity and nature of interest:

5.   Is party a trade association? (amici curiae do not complete this question)   ☐ YES ☑ NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.   Does this case arise out of a bankruptcy proceeding?   ☐ YES ☑ NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/ Ryan S. Hardy                          Date:        10/17/2019

Counsel for: Commonwealth of Virginia, et al.

## CERTIFICATE OF SERVICE
**************************

I certify that on        10/17/2019        the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

/s/ Ryan S. Hardy                                             10/17/2019
        (signature)                                               (date)

ii

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF CONTENTS ................................................................................. iii

TABLE OF AUTHORITIES ............................................................................. v

INTRODUCTION ........................................................................................... 1

JURISDICTIONAL STATEMENT .................................................................... 2

ISSUES PRESENTED ..................................................................................... 2

STATEMENT OF FACTS ............................................................................... 3

    I.     Organization of the Center ............................................................. 3

    II.    Workforce Transition Act Process ................................................ 5

          A.    Matlock receives a budget reduction mandate for fiscal years 2017 and 2018. ................................................... 5

          B.    Matlock begins an internal inquiry into how to reduce the Center's budget for fiscal years 2017 and 2018. ....................... 6

          C.    Matlock seeks approval for his WTA plan. ............................... 9

          D.    Matlock implements his WTA plan. ........................................ 13

    III.    Carmack's complaints of alleged fraud, waste, and abuse. ................ 15

    IV.    Procedural History.................................................................... 19

SUMMARY OF ARGUMENT ........................................................................ 23

STANDARD OF REVIEW ............................................................................. 24

ARGUMENT ............................................................................................... 25

iii

I.      The district court properly denied Carmack's motion to strike Michael Maul's second declaration......................................25

        A.      Maul's second declaration did not present new factual allegations, much less attempt to resolve alleged discrepancies. ...............................................................26

        B.      Appellees adequately identified the substance of Maul's anticipated knowledge in their Rule 26(a)(1) disclosure and document production...........................................30

        C.      Carmack failed to take advantage of multiple opportunities to depose Maul...................................34

II.     Carmack forfeited his argument that the district court erred in applying the "legitimate business reason" analysis to the Whistleblower Act.................................................................34

        A.      The district court did not commit "fundamental error" because no court decision has addressed the evidentiary burden for causation under the Whistleblower Act. ................36

        B.      Any possible error did not seriously affect the fairness, integrity, or public reputation of the judicial proceedings........39

                1.      Carmack had multiple opportunities to challenge whether the "legitimate business reason" defense applied............................................................40

                2.      Appellees have amassed substantial, overwhelming, and uncontroverted evidence that Matlock's decision to abolish Carmack's position was due to a budget reduction mandate and was not motivated by retaliatory animus. ..............................41

        C.      Carmack's belated request for certification of this issue to the Supreme Court of Virginia is improper. .........................47

CONCLUSION .....................................................................48

CERTIFICATE OF COMPLIANCE....................................................50

CERTIFICATE OF SERVICE ......................................................51

iv

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)............................................................25

*Beale v. Jones*,
171 S.E.2d 851 (Va. 1970) .................................................36

*Bentley v. Felts*,
445 S.E.2d 131 (Va. 1994) .................................................36

*Bocock v. Specialized Youth Servs. of Va.*,
Civil Action No. 5:14-cv-00050, 2015 U.S. Dist. LEXIS 144598
(W.D. Va. Oct. 23, 2015)....................................................28

*Bonds v. Leavitt*,
629 F.3d 369 (4th Cir. 2011) .............................................24

*Bresler v. Wilmington Trust Co.*,
855 F.3d 178 (4th Cir. 2017) .............................................34

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
401 U.S. 402 (1971)............................................................30

*Clawson v. FedEx Ground Package Sys., Inc.*,
451 F. Supp. 2d 731 (D. Md. 2006)...................................28

*DeJarnette v. Corning, Inc.*,
133 F.3d 293 (4th Cir. 1998) .......................................43, 44

*Dow AgroSciences LLC v. Nat'l Marine Fisheries Serv.*,
707 F.3d 462 (4th Cir. 2013) .............................................30

*Edwards v. City of Goldsboro*,
178 F.3d 231 (4th Cir. 1999) .......................................31, 41

*Etheridge v. Norfolk S. R. Co.*,
129 S.E. 680 (Va. 1925) .....................................................37

*Evans v. Technologies Applications & Serv. Co.*,
  80 F.3d 954 (4th Cir. 1996) ...............................................................25

*Giannopoulos v. Brach & Brock Confections*,
  109 F.3d 406 (7th Cir. 1997) ............................................................47

*Golden Nugget, Inc. v. Chesapeake Bay Fishing Co., L.L.C.*,
  93 F. App'x. 530 (4th Cir. 2004)......................................................34

*Guantanamera Cigar Co. v. Corporacion Habanos, S.A.*,
  263 F.R.D. 1 (D.D.C.2009)...............................................................31

*Halifax Corp. v. First Union Nat'l Bank*,
  546 S.E.2d 696 (Va. 2001) ...............................................................38

*Henson v. Liggett Group, Inc.*,
  61 F.3d 270 (4th Cir. 1995) ..............................................................47

*Hux v. City of Newport News*,
  451 F.3d 311 (4th Cir. 2006) ............................................................43

*IGEN Int'l, Inc. v. Roche Diagnostics GmbH*,
  335 F.3d 303 (4th Cir. 2003) ............................................................35

*Ilozor v. Hampton Univ.*,
  No. 4:06-cv-90, 2007 U.S. Dist. LEXIS 33032 (E.D. Va. May 3,
  2007) *aff'd*, 286 F. App'x 834 (4th Cir. 2008) .................................28

*Muth v. United States*,
  1 F.3d 246 (4th Cir. 1993) ................................................................35

*Nat'l Bank of Washington v. Pearson*,
  863 F.2d 322 (4th Cir. 1988) ............................................................48

*NCO Fin. Sys., Inc. v. Montgomery Park, LLC*,
  918 F.3d 388 (4th Cir. 2019) ............................................................25

*Owens-Illinois, Inc. v. Rapid Am. Corp. (In re Celotex Corp.)*,
  124 F.3d 619 (4th Cir. 1997) ......................................................35, 39

*Passaro v. Virginia*,
  935 F.3d 243 (4th Cir. 2019) ......................................................47, 48

*Puentes Fernandez v. Keisler*,
   502 F.3d 337 (4th Cir. 2007) ..................................................47

*Raynor v. Pugh*,
   817 F.3d 123 (4th Cir. 2016) ..................................................27

*Rowe v. Marley, Co.*,
   233 F.3d 825 (4th Cir. 2000) ..................................................46

*S & C Co. v. Horne*,
   235 S.E.2d 456 (Va. 1977) ....................................................36

*S. States Rack & Fixture Inc. v. Sherwin-Williams Co.*,
   318 F.3d 592 (4th Cir. 2003) ..................................................26

*Scarborough v. Aegis Communs. Group, Inc.*,
   No. 99-2671, 2000 U.S. App. LEXIS 14321
   (4th Cir. Jun. 20, 2000) ......................................................39

*Shaw v. Titan Corp.*,
   498 S.E.2d 696 (Va. 1998) ................................................37, 38

*Stewart v. Hall*,
   770 F.2d 1267 (4th Cir. 1985) ................................................36

*United States v. Alli-Balogun*,
   72 F.3d 9 (2d Cir. 1995) ......................................................39

*United States v. Cotton*,
   535 U.S. 625 (2002)............................................................39

*United States v. Lavabit, LLC (In re Under Seal)*,
   749 F.3d 276 (4th Cir. 2014) ..............................................35, 36

*United States v. Mackins*,
   315 F.3d 399 (4th Cir. 2003) ..................................................39

*United States v. Mason*,
   52 F.3d 1286 (4th Cir. 1995) ..................................................33

*United States v. Neal*,
   101 F.3d 993 (4th Cir. 1996) ..................................................36

*United States v. Olano*,
  507 U.S. 725 (1993).................................................................35

*United States v. Pittman*,
  209 F.3d 314 (4th Cir. 2000) ..............................................33

*United States v. Promise*,
  255 F.3d 150 (4th Cir. 2001) ..............................................36

*United States v. Williams*,
  455 F.3d 724 (4th Cir. 2006) ..............................................28

*Virginian-Pilot Media Cos., LLC v. Dow Jones & Co.*,
  698 S.E.2d 900 (Va. 2010) ..................................................38

*Waste Mgmt. Holdings v. Gilmore*,
  252 F.3d 316 (4th Cir. 2001) ..............................................26

**Statutes**

5 U.S.C. § 706................................................................................30

28 U.S.C. § 1291..............................................................................2

28 U.S.C. § 1367..............................................................................2

42 U.S.C. § 1983............................................................................19

Va. Code Ann. § 2.2-3009 ................................................*passim*

Va. Code Ann. § 2.2-3011(A)....................................................37, 38

Va. Code Ann. § 2.2-3011(B)...........................................................38

Va. Code Ann. § 2.2-3201 ..................................................................7

Va. Code Ann. § 23.1-100 ..................................................................3

Va. Code Ann. § 23.1-1300-2913.......................................................3

Va. Code Ann. § 23.1-3125 ................................................................3

Va. Code Ann. § 23.1-3128 ................................................................4

Va. Code Ann. § 40.1-51.2:1 ............................................................39

Va. Code Ann. § 65.2-308(A) ..................................................37

**Rules**

Fed. R. App. P. 28(a)(9)(A) ...........................................31, 41

Fed. R. App. P. 32(a)(5) and (6) ........................................50

Fed. R. App. P. 32(a)(7)(B) ...............................................50

Fed. R. App. P. 32(a)(7)(B)(iii) ........................................50

Fed. R. Civ. P. 12(b)(6) ....................................................21

Fed. R. Civ. P. 26, advisory committee's note, 1993 amend. .................................31

Fed. R. Civ. P. 26(a) ..........................................................25

Fed. R. Civ. P. 26(a)(1) ...............................................1, 23, 30, 33

Fed. R. Civ. P. 26(a)(1)(A)(i) ...........................................31

Fed. R. Civ. P. 26(e) ..........................................................25

Fed. R. Civ. P. 37(c)(1) .....................................................25

Fed. R. Civ. P. 56(c)(1)(A) ..............................................30

**Other Authorities**

House Bill 1500 .............................................................8, 21

U.S. Const. amend. I .......................................................19, 40, 41

## INTRODUCTION

A core obligation of every litigant is to ensure that the record adequately supports his claims and defenses. In this appeal, Plaintiff-Appellant William Carmack attempts to deflect from his failure to preserve the very errors he now claims the district court made by recycling skewed accusations that lack evidentiary support. Carmack's truncated citations to the record are insufficient to justify reversing the district court's grant of summary judgment.

Using the district court's prior, uncontested discovery sanctions order as a crutch, Carmack argues that Appellees should not be allowed to rely on a second declaration from Michael Maul to explain how David Matlock sought and received approval to reorganize the Southwest Virginia Higher Education Center ("Center") and abolish Carmack's position. But Appellees' Rule 26(a)(1) disclosure of Maul, the production of documents detailing Maul's involvement in Matlock's reorganization proposal, and Maul's first, unchallenged declaration gave Carmack sufficient opportunity to request Maul's deposition even after discovery reopened. Carmack chose not to. His effort to strike Maul's second declaration now is a diversionary tactic to deny Appellees competent evidence.

Carmack also argues that the district court erred in applying the *McDonnell Douglas* burden-shifting analysis to his state wrongful termination claim. But Carmack forfeited that challenge on appeal by failing to make that argument to the

1

district court. The paucity of either a Virginia Supreme Court case discussing the causation standard under Virginia's statutory whistleblower protection act or any meaningful evidence of retaliatory motive compel the conclusion that the district court did not make any fundamental error that seriously affected the fairness, integrity, or public reputation of the judicial proceedings.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over Carmack's federal claims under 28 U.S.C. § 1331 and supplemental jurisdiction over his state law claims under 28 U.S.C. § 1367. Carmack timely filed a notice of appeal of the District Court's August 29, 2019 final order dismissing Count I and August 29, 2019 final order denying Carmack's motion to strike the second declaration of Michael Maul. This Court has jurisdiction under 28 U.S.C. § 1291.

## ISSUES PRESENTED

1.      Whether the district court properly denied Carmack's motion to strike the second declaration of Michael Maul.

2.      Whether the district court properly granted summary judgment on Carmack's claim under the Virginia's Fraud, Waste, and Abuse Whistle Blower Protection Act ("Whistleblower Act"), Va. Code Ann. § 2.2-3009, *et seq*.

## STATEMENT OF FACTS

### I.    Organization of the Center

1.    Established in 1991, the Center partners with public and private colleges and universities to provide degree programs, certificates, and professional development courses. J.A. 123. The core responsibilities of the Center are (1) encouraging the expansion of higher education degrees, adult and continuing education, workforce training, and professional development through partnerships with public and private institutions of higher education;[1] (2) facilitating the delivery of teacher training programs leading to licensure and undergraduate and graduate degrees; (3) maintaining and disseminating information on existing educational programs and resources; and (4) developing specific goals for higher education in southwest Virginia. *See* Va. Code Ann. § 23.1-3125.

The Center is governed by a twenty-three-member Board of Trustees that includes members of the Virginia General Assembly, university presidents, agency heads, and citizen members appointed by the Governor. J.A. 124. The Board of Trustees appoints the Executive Director, who oversees all aspects of the

---

[1] The Center itself is not an institute of higher education. Not only does Subtitle IV of Title 23.1 of the Code of Virginia not classify the Center as an "Institution of Higher Education," *see* Va. Code Ann. § 23.1-1300-2913, but the authority creating the Center, Va. Code Ann. § 23.1-3125, does not permit it to grant associate, bachelor, or advanced degrees. *See* Va. Code Ann. § 23.1-100.

management and operation of the Center. *See* Va. Code Ann. § 23.1-3128. The Executive Director's "major duties" also include "develop[ing] plans for long-term educational programs and financial stability," as well evaluating and terminating Center staff with the Board of Trustee's authorization. J.A. 1641-1642.

The Board of Trustees has an Executive Committee comprised of five members of the full Board. The Executive Committee: (1) "oversees the affairs of the Center between Board meetings"; (2) handles "sensitive issues such as personnel matter[s] (where confidentiality is required and would be hard to ensure with a large group)"; and (3) "offers input into decisions that need a timely resolution for the efficient operation of the Center." J.A. 124. The common practice for the Executive Director is to bring personnel issues to the Executive Committee rather than the full Board of Trustees. J.A. 1787-1788.

2.    In 2015, Defendant-Appellee David N. Matlock was appointed Executive Director of the Center,  J.A. 123, following the retirement of Dr. Rachel Fowlkes, the original Executive Director, J.A. 555. Dr. Fowlkes had hired Carmack in 2012 as the Chief Financial Officer ("CFO") of the Center.[2] J.A. 125. As CFO, Carmack's duties included: (1) securing tenants involved in the research,

---

[2] Carmack also served as Chief Executive Officer of the separate Southwest Virginia Higher Education Center Foundation ("Foundation"). The Foundation is a separate 501(c)(3) nonprofit organization that was formed to support the educational programs and activities of the Center. J.A. 124, 577.

manufacture, and development of "Clean Fuel Energy" products and systems for the "Energy Center"; (2) securing research and development grants to develop growth-oriented, investment-worthy technology companies in rural southwestern and southern Virginia; (3) negotiating new programs coming into the Center; and (4) overseeing the Center's financial affairs. J.A. 125, 736.

3.     The Center originally contracted with the University of Virginia ("UVA") to administer and manage human resource issues for the Center. J.A. 125, 568. On July 1, 2018, however, UVA discontinued providing human resource services to the Center, at which point these services were shifted to Virginia's Department of Human Resource Management ("DHRM"). J.A. 126, 165.

## II.     Workforce Transition Act Process

### A.     Matlock receives a budget reduction mandate for fiscal years 2017 and 2018.

4.     On August 26, 2016, Matlock received a memo from the Governor's Chief of Staff requesting that all agency heads submit a budget reduction plan for fiscal year 2017 in light of a $1.5 billion budget shortfall in the Commonwealth. J.A. 126, 1260-1261. The August memo instructed agency heads to "prepare savings strategies for FY 2017 equal to five (5) percent of your agency's adjusted legislative general fund appropriation." J.A. 146. The memorandum further stated that "it is important that the majority of your reduction strategies emphasize recurring savings rather than one-time savings." *Id*. In response, Carmack prepared

5

a savings plan that proposed abolishing a vacant marketing position and reducing maintenance expenditures, J.A. 1998-1999, and submitted the plan to the Department of Planning and Budget ("DPB") on September 20, 2016, J.A. 2004-2005, as required by the August budget reduction memo, J.A. 146.

5.      On September 27, 2016, Matlock received a second memo providing additional guidance about budget savings plans for fiscal year 2018. J.A. 149. The September memo stated that agencies "should plan for the five percent savings required in FY 2017 to continue into FY 2018" and reaffirmed that "saving strategies for FY 2018 should provide ongoing savings in future fiscal years in order to maintain structural balance." J.A. 150. Although Matlock acknowledged that the impact of the August budget reduction memo was "very small," the September budget reduction memo "frightened" him and "made [him] realize that [he] needed to look for a more long-term [budgetary] solution." J.A. 1944-1945, 1963.

## B.      Matlock begins an internal inquiry into how to reduce the Center's budget for fiscal years 2017 and 2018.

6.      Given both budget reduction memos, Matlock began to research available savings options. Matlock was concerned that using general funds to cover the budget reductions would not be a viable long-term strategy because the mandate stressed recurring savings strategies for multiple fiscal years. J.A. 126. Thus, Matlock concluded that reorganization of the Center was the most

appropriate and sustainable long-term option given what he observed to be significant overlap in responsibilities between senior administrators. *Id.* After receiving the September memo, Matlock disagreed with Carmack's original plan to eliminate the marketing position because it was "vital to increase Center awareness to students" and "key to ensure the Center is meeting the workforce needs of the region." J.A. 220, 1274, 1949-1950.

Instead, Matlock considered a workforce reorganization using the Workforce Transition Act ("WTA"), Va. Code. Ann. § 2.2-3201, *et seq*., J.A. 127. Matlock sought advice from Chris Fields, the former Director of Finance & Legislative Affairs at the Center, J.A. 992, 1261, and Donna Kauffman, the UVA Human Resource Specialist assigned to the Center, J.A. 127. During an October 2016 phone call with Kauffman, Matlock stated that the positions then held by Carmack and two others might be possible candidates for elimination under the WTA. J.A. 127. On November 9, 2016, Kauffman sent Matlock the estimated cost for eliminating Carmack's CFO position. J.A. 157. Matlock met with UVA personnel to discuss the WTA proposal and received templates of necessary documents. J.A. 161-166.

Around January 16, 2017, Matlock had another conversation with Fields to review the WTA process and get a clearer understanding of the necessary steps. J.A. 128. Fields explained that Matlock needed approval from the DPB before

7

moving forward. J.A. 1261. Fields further explained that with DPB approval, the Virginia Retirement System ("VRS") would likely absorb the retirement/severance costs related to the WTA process such that they would not be incurred by the Center. J.A. 128.

7.      On February 2, 2017, Matlock met with Michael Maul of DPB to discuss his intention to move forward with his WTA proposal. J.A. 168, 382-383. Maul reviewed the steps Matlock needed to take and stressed the importance of seeking agency approvals at the beginning of the process so that VRS would cover the cost of implementing the WTA. J.A. 129. Matlock also asked whether the savings plan Carmack had submitted earlier on September 20, 2016 was binding on Matlock's decision.[3] Maul agreed that "[o]nce a budget submission has been approved by the General Assembly, it is anticipated [that] an agency will adhere to that budget[,]" but Matlock, as Executive Director, "had the flexibility to administer the budget reduction in the way that he saw fit because the General Assembly had not specifically directed how the Center was to implement the reductions to the budget." J.A. 2170, *see* J.A. 1812 (House Bill 1500).

_____

[3] The August memo advised agency heads that "[a]ny questions or suggestions about [the budget reduction] process, *or the subsequent budget decisions* that will be made, should be directed to . . . the Department of Planning and Budget." J.A. 146 (emphasis added). The Chief of Staff identified Maul as the person the Center would consult regarding budget reductions and explained that he himself relied "extensively" on Maul's input and guidance. J.A. 2082.

8.    On February 3, 2017 Matlock received updated estimates for eliminating five positions at the Center, including Carmack's. J.A. 170-171. Between February and May of 2017, Matlock consulted senior members of the Center's leadership team, Center partners, Dr. Fowlkes, Fields, and members of the Board of Trustees to identify potential improvements. J.A. 129-130. Based on these conversations and his research and observations of departmental operations at the Center, Matlock decided that reorganization was necessary to streamline duplicative administrative responsibilities and meet the requirements of the budget reduction memos. J.A. 130, 184-199.

With respect to the CFO position, Matlock noted that the Center had operated without a CFO position from 1992 until 2012. J.A. 130, 396. With an anticipated reduction in Carmack's responsibilities, J.A. 225, Matlock felt that day-to-day operations—such as advanced fiscal bookkeeping, accounting, budgeting, and managing accounts receivable—could be managed by the Director of Finance at a significantly lower salary than what the CFO was being paid. J.A. 131, 173-182, 396.

### C.    Matlock seeks approval for his WTA plan.

9.    On June 30, 2017, Matlock met with the Executive Committee to conduct his annual review and discuss his WTA proposal. J.A. 201-202. Matlock told the Executive Committee that Carmack was included in the WTA proposal

9

because the Center did not require a CFO position. J.A. 132. A member of the Executive Committee present during the June 30, 2017 meeting confirmed that Matlock "stressed that the responsibilities of the CFO position overlapped significantly with the responsibilities of other, lesser-paid, employees of the Center" and that his reason for eliminating the three positions was to "reduce spending and create more room in the budget for necessary structural repairs at the Center." J.A. 1788.

The Executive Committee endorsed Matlock's plan to move forward with the implementation of the WTA proposal. J.A. 201-202. Matlock also stayed in communication with his contacts at UVA to keep them apprised of the status of the WTA proposal and provide them with documents justifying the personnel actions he intended to take. J.A. 206-215.

10. On November 13, 2017, Matlock emailed the Center's WTA proposal to the Directors of DHRM and DPB. J.A. 217. The proposal included Matlock's workforce reorganization plan, justifications for the elimination of Director of Operations, Conference Services Specialist, and Chief Financial Officer positions, and the expected savings that would accrue from implementing the plan.[4] J.A. 218-

---

[4] For example, abolishing the CFO position and incorporating the pay raise needed to redistribute those responsibilities to a lower administrative position would result in a net savings of $154,276. J.A. 1821-1824.

221. The WTA proposal explained that "the [Center] had experienced budgetary reductions of $108,058.00 (5%) for 2017-2018[,]" which required the elimination of certain positions "to remain responsive to regional needs and required fiscal accountability." J.A. 219. Once all the costs and savings were tallied, the total net savings was $108,058.00, J.A. 221, which was equal to the 5% budget reduction mandate for fiscal years 2017 and 2018. J.A. 1809-1812.

On November 21, 2017, DPB approved Matlock's WTA proposal after concluding that it was an appropriate response to the budget reduction mandate. J.A. 134. Maul stated that "[b]ecause the Center had been mandated by the General Assembly and Governor of Virginia to enact budget reductions for fiscal years 2017 and 2018, we were satisfied that Matlock's WTA proposal was proper." J.A. 383. Matlock received with a signed letter from DPB approving the WTA exemption request if the director of DHRM also approved the proposal. J.A. 393.

11. On November 22, 2017, Matlock received an email from Deborah Rigdon of DHRM, who replaced Kauffman in overseeing the Center's WTA process. The email sought additional information about Matlock's proposal and offered assistance in its later implementation. J.A. 223. Rigdon explained that her "main purpose was to ensure that the WTA process complied with state policy and protected the rights of the individuals affected by the WTA plan." J.A. 395. Matlock and Rigdon spoke over the telephone the same day to review the proposal

11

and the steps Matlock needed to take to receive the approval of DHRM. J.A. 134. On November 27, 2017, Matlock forwarded to Rigdon the timeline for the WTA process. J.A. 229. At no point did Rigdon share with Matlock why she wanted this information other than it being part of DHRM's standard review of WTA proposals.[5] J.A. 134.

Rigdon also requested and compared Hensley's employee work profile to Carmack's profile to determine whether Hensley could take on Carmack's responsibilities. J.A. 395-396. Following her review of the requested materials, Rigdon concluded that "Matlock was justified in eliminating the CFO position" and that this action made sense in the long run." J.A. 395. On December 8, 2017, Rigdon forwarded Matlock edits to the WTA proposal and restructuring analysis, J.A. 232-234, and on December 18, 2017, forwarded severance benefit calculations for Carmack, Brooks, and Williams, J.A. 236-239.

12.    On December 21, 2017, UVA counsel advised Matlock regarding the WTA process. J.A. 241. In this email, counsel discussed the presence of a police officer to provide security on the date that Carmack and others were officially

---

[5] Rigdon explained that because she was aware by this point that Carmack had filed a formal complaint against Matlock, she wanted to "make sure Matlock had provided sufficient justification to support the abolishment of Carmack's position." J.A. 395. To that end, Rigdon requested the June 30, 2017 Executive Committee meeting minutes and timeline of events to "confirm that the decision to abolish Carmack's position occurred prior to any complaint Carmack had made." *Id.*

informed of the elimination of their positions. J.A. 241-242. On January 3, 2017, Matlock emailed Rigdon, Griffin, Kauffman, and Summers final documents related to the implementation of the WTA proposal, including a layoff notification letter for each impacted employee, documents related to severance benefits, and suggested talking points during the layoff meetings, for their review and suggestions. J.A. 246-287. That same day, Rigdon informed Matlock that his WTA proposal conformed to state policy and the Code of Virginia. J.A. 271, 397.

### D.    Matlock implements his WTA plan.

13.    On January 4, 2018, Matlock told Carmack that his position was being eliminated under the WTA. J.A. 136. Matlock gave Carmack a letter explaining that the decision was due to budgetary reductions. J.A. 289-290. Matlock also provided Carmack with documents explaining all the benefits he was owed under the WTA. J.A. 291-338. Two other employees were similarly informed that their positions were being eliminated, and Carmack and the other two employees were escorted out of the Center by a police officer. J.A. 137. On January 19, 2018, Matlock forwarded additional documents to Carmack, one of which enabled him to receive preferential hiring for any position within a state agency that is in the same role as his former position and for which he is minimally qualified. J.A. 342.

14.    Matlock also informed the Board of Trustees via email of the reorganization. J.A. 357. The email stated that in response to mandated reductions

13

over two budget cycles, Matlock concluded that "restructuring was necessary to become more responsive to the region's workforce, creating a greater return on investment for the Commonwealth and the citizens of SW Virginia."[6] *Id.* Three members of the Board reached out to Matlock for further clarification as to why the Center needed to eliminate positions. J.A. 1249-1250. Matlock answered their questions, and each said that they "understood" the decision. J.A. 1257-1258.

15.    On June 12, 2018, Matlock received final approval from DHRM of its WTA exemption request, which exempted the Center from incurring costs for any enhanced retirement benefits under the WTA, J.A. 363-364. Rigdon confirmed that she worked closely with Matlock "to ensure his WTA actions complied" with state policy and that she "provided guidance . . . regarding the process used to identify the selected positions as well as layoff notifications and communication of severance benefits." J.A. 1814. Rigdon "found Matlock to be professional and thorough throughout the time [she] provided assistance to him." J.A. 396.

---

[6] Carmack states that Matlock never informed Marcia Gilliam of the WTA proposal without explaining the significance. Opening Br. at 12. But the record demonstrates that no reason existed to notify Gilliam because her term on the Board of Trustees had ended by December 14, 2017. J.A. 1465.

III.    **Carmack's complaints of alleged fraud, waste, and abuse.**[7]

16.    The evidence surrounding the relationship between Carmack and Matlock derives primarily from Carmack himself, who testified that he "never felt like [h]e had a good relationship" with Matlock because he "was excluded immediately from meetings . . . ." J.A. 468. Carmack further alleges that he observed that Matlock was not following policies and procedures related to hiring, accounts payable, accounts receivable, etc. J.A. 648-649. These alleged violations included Matlock's (1) submitting an invoice for payment of $1,250 to reimburse a middle school where Matlock's son was the principal for student travel to a robotics competition at James Madison University;[8] (2) allowing for the approval of overtime for a husband and wife computer team whom Carmack suspected of collecting overtime in a fraudulent manner; (3) failing to submit travel invoices in a timely fashion; (4) hiring a personal friend, Joe Mitchell, as a maintenance supervisor without going through the interview process;[9] (5) failing to account for

---

[7] Much of the evidence underlying Carmack's complaints is disputed. However, a brief recitation of the allegations is necessary to provide meaningful context.

[8] Carmack admitted that he based his opinion only on the fact that he had not seen Matlock give similar offers to other schools. J.A. 693-694.

[9] The Board of Trustees did not object to Matlock's proposal to hire Mitchell as a part-time *interim* manager "until [the position] is properly advertised and ultimately filled." J.A. 1456. And Carmack knew that Mitchell had applied for the full-time Facility Manager position prior to making the complaint. J.A. 695-697.

monies received during various fundraisers;[10] (6) allowing a large piece of art to go missing; and (7) granting access to human resource systems and confidential information to an employee without proper clearance. J.A. 81-85, 426-427.

Carmack alleges that he made numerous "internal warnings and complaints" to Matlock to report these policy and procedure violations, which the district court summarized as follows: 1) **November 2015**: Carmack reminded Matlock that he would not deviate from Commonwealth Accounting Policy and Procedures, to which Matlock responded with a story about how mother birds "needled" hatchlings to incentivize them to leave the nest, J.A. 638-639; 2) **December 2015** and **January 2016**: Carmack complained to Matlock that he violated state policy by pre-selecting Tolbert, J.A. 650-651, 1718; 3) **September 2016**: Carmack met with Matlock to "caution" him about pre-selecting Mitchell to be maintenance supervisor without being interviewed by a selection committee, J.A. 1557; and 4) **December 2016**: Carmack complained to Matlock about the payment of overtime.[11]

---

[10] Carmack could not know the specifics of the fundraisers because he conceded that he lacked any knowledge of those events. J.A. 683. And the record establishes that the money was not missing. A Center employee testified that she had the cash in her possession. J.A. 1546.

[11] Carmack's sworn declaration states that he complained about the overtime payments on December 1, 2015, J.A. 1718, but he later testified at the summary judgment hearing that he made the complaint in December 2016, J.A. 1905-1906.

Carmack explained that although he initially thought that Matlock was "new" and would "figure it out," he became concerned that continued nonfeasance would imperil his own job. J.A. 474. Thus, "[i]t wasn't until the end of [2016] that [Carmack] felt like . . . [Matlock's conduct] [wa]s severe enough" to report his beliefs outside the Center. J.A. 475. Carmack first complained to the UVA ombudsman in February 2017. J.A. 657. Carmack subsequently discussed the complaints with various individuals at DHRM, including Rigdon. J.A. 427-428. Carmack was ultimately advised that he should take his concerns to the Office of State Inspector General ("OSIG"). Carmack attempted to file a formal complaint via Virginia's Fraud, Waste, and Abuse Hotline ("Hotline") in June 2017, but was asked to refile in July 2017. J.A. 660.

17.    Carmack's Hotline complaint was assigned to Tim Sadler. J.A. 366. The complaint contained sixteen items, J.A. 1557-1563, only six of which Sadler ultimately determined warranted further investigation, J.A. 419. The six allegations included: (1) an IT professional at the Center has inappropriate and unnecessary access to human resource systems; (2) two wage employees waste state funds performing programming and maintenance for a system that handles scholarships and loan funds; (3) Matlock inappropriately authorized grant funding for a robotics program at a school where his son was the principal, but not at other regional schools; (4) Matlock did not submit travel reimbursement requests in a timely

manner; (5) Matlock did not record his time at work in the Center's time clock system as required by policy; and (6) Matlock approved sole sourcing a purchase after the purchase was made. J.A. 370-374.

On October 16, 2017, Sadler called Matlock and explained that someone had filed a Hotline complaint against him and that the Hotline provides a confidential method for state employees to report suspected fraud, waste, or abuse in state agencies. J.A. 139. Sadler did not identify Carmack as the complainant. J.A. 420. Matlock informed Sadler that he had initiated a process under the WTA "due to mandatory budget cuts." J.A. 139. Matlock stated that certain staff, including Carmack, would be laid off as part of a reorganization intended to make the Center more efficient. J.A. 1270-1271. Matlock then reviewed the steps he had taken during the WTA proposal and the timing of each step. J.A. 139, 420. Sadler told Matlock that the WTA process could continue if Matlock began the process prior to his knowledge of the anonymous caller's complaint. J.A. 139. Sadler did not include Matlock's WTA process as part of his investigation. J.A. 420.

On November 8, 2017, Sadler informed Matlock that he had completed his investigation. J.A. 368. The OSIG Report found allegations; three allegations—(2) (overtime payment), (3) (misappropriation of funds to the robotics competition),[12]

---

[12] Specifically, "robotics support was provided to a number of other areas for the four years reviewed including six other schools." J.A. 372.

18

and (5) (Matlock's time recording practices)—"unsubstantiated"; two allegations— allegations (1) and (4)—"partially substantiated;" and allegation (6) "substantiated;" J.A. 370-374. With respect to allegation (1), Sadler noted only that the employee's position description needed to be updated to reflect his new responsibilities. J.A. 370-371. With respect to allegation (4), Sadler found that Matlock submitted travel reimbursement vouchers late. J.A. 372. With respect to allegation (6), Sadler concluded that although Matlock's sole source justification "makes sense," Matlock "should ensure that future sole source justifications are approved prior to service performance." J.A. 373-374. None of the substantiated allegations involved misuse of state funds or fraud.

## IV.    Procedural History.

18.    Carmack filed his lawsuit state court, which Appellees removed to federal court without objection. Carmack's Amended Complaint contained four allegations of wrongful discharge. Count I alleged a violation of Va. Code § 2.2-3009, *et seq.* ("Whistleblower Act"). Count II alleged retaliation in violation of the First Amendment pursuant to 42 U.S.C. § 1983. Count III alleged a state common law claim (*Bowman* claim). The speech undergirding Counts I through III was Carmack's complaints about the alleged fiscal improprieties by Matlock. Count IV alleged that Carmack was terminated due to his political affiliation in violation of the First Amendment.

19.    On October 26, 2018, Appellees proffered their Initial Disclosure and several documents supporting their defense that Carmack's position was abolished under Matlock's WTA proposal. J.A. 1403. The Disclosure explained that the "WTA process was necessary to make the Center more effective and efficient. Key vacant positions were frozen due to budget reductions and the Center faced another 5% budget reduction." J.A. 2140. The Disclosure further stated that "[o]n February 2, 2017, Matlock met with Michael Maul at the [DPB] to inform him that he would be submitting a WTA request later in the year and that the Chief Financial Officer position was one of the positions planned for elimination." J.A. 2140-2141. Concurrent with the Disclosure, Appellees produced the WTA Exemption Request and Budget Reduction and Restructuring Proposal that were sent to DPB for approval.[13] J.A. 218-221, 2144. On December 7, 2018, Appellees reiterated that Maul "ha[d] knowledge that the Center was developing a WTA plan and restructuring proposal." J.A. 2137, 2151.

On December 21, 2018, Appellees produced electronic discovery, ECF No. 75-1 at ¶5, which included two emails from Kauffman dated November 8, 2016 and November 9, 2016 that identified Carmack as being potentially impacted by "state budget cuts." J.A. 154-157. That same day, Appellees identified the

---

[13] Although not included in the Joint Appendix, Hardy (3d) Declaration outlines the history of Appellees' document production in this case. ECF No. 75-1.

Executive Amendments to the 2016-2018 Biennial Budget and House Bill 1500 (Chapter 836) as documents containing information relevant to Appellees' claims and defenses. J.A. 1806-1812.

On January 18, 2019, Appellees again supplemented their document production, which included the February 2, 2017 email from Michael Maul confirming Appellees' Disclosure, J.A. 168, and the approval letter from Timberlake on behalf of DPB, J.A. 392-393. Matlock was thereafter deposed on January 24, 2019. J.A. 1153.

After the close of discovery, Appellees realized that the two budget reduction memos had not been produced. ECF No. 75-1 at ¶ 14. The exclusion of these documents from prior productions was inadvertent. J.A. 1871. These documents were produced on March 22, 2019, three days after the March 18, 2019 discovery deadline.

20. In support of their motion for summary judgment,[14] Appellees submitted the first declaration from Michael Maul, in which he stated that "[b]ecause the Center had been mandated by the General Assembly and the Governor of Virginia to enact budget reductions for fiscal years 2017 and 2018,

---

[14] Two days after Appellees field their motion for summary judgment, The district court dismissed Counts III and IV under Rule 12(b)(6) of the Federal Rules of Civil Procedure. J.A. 527.

[DPB] w[as] satisfied that Matlock's WTA proposal was proper." J.A. 383. Maul also confirmed that he discussed with Matlock eliminating the CFO position in February 2017. J.A. 382-383. Carmack did not object to this declaration.

Based on Appellees' untimely disclosure of the budget reduction memos, Carmack filed a motion for discovery sanctions. ECF No. 71. The only relief Carmack sought was to strike the memos and Matlock's declaration; he did not request additional depositions. J.A. 1864-1868. The district court reopened the depositions of individuals whom Carmack had previously deposed, allowed the deposition of Paul Reagan, and ordered each party to file one supplemental brief. J.A. 106 at 1. J.A. 2178, ECF No. 79 at 6-7. Carmack had to conduct discovery by June 21, 2019.

21.    During his June 6, 2019 deposition, the Governor's Chief of Staff testified that he did not draft the budget reduction memos. J.A. 2040. He also confirmed that DPB had "an active role in reviewing the[] budget submissions. J.A. 2078. The Chief of Staff testified that he "would rely on the input and guidance that Michael Maul would provide . . . extensively." J.A. 2082. At no time did Carmack seek permission to depose Maul or otherwise ask the district court to reconsider the remedy it provided.

In his supplemental brief, Carmack attempted to demonstrate that Matlock's reliance on the budget reduction memos was pretextual by challenging Matlock's

22

use of the WTA to respond to the 5% budget reductions. Appellees submitted a second declaration from Maul to respond directly to Carmack's unsupported allegations and expand upon evidence already in the record. J.A. 2169-2172. Carmack moved to strike Maul's second declaration. J.A. 2173.

22.    The district court denied Carmack's motion to strike Maul's second declaration. J.A. 2178. That same day, the district court granted Appellees' motion for summary judgment because "Carmack simply has not presented sufficient evidence for a reasonable jury (1) to conclude that his various complaints were a 'substantial' or 'motivating' factor in, let alone a but for cause of, his termination, (2) to discredit the underlying justification for abolishing the CFO position, or (3) to cast doubt on the legitimacy of the WTA process." J.A. 2261-2263.

Carmack timely noted his appeal of only the dismissal of Count I and the denial of his motion to strike Maul's second declaration.

## SUMMARY OF ARGUMENT

Carmack moved to strike Maul's second declaration notwithstanding Appellees' disclosure of Maul and production of documents detailing his involvement in Matlock's WTA proposal. Carmack excuses his failure to depose Maul because he could not appreciate the significance of Maul's potential testimony until after he received the budget reduction memos. But Rule 26(a)(1) does not require litigants to define the precise contours of a potential witness's

23

knowledge. The district court did not abuse its discretion in refusing to strike Maul's second declaration where Appellees' detailed disclosures, multiple document productions, and Maul's first, unchallenged declaration gave Carmack sufficient context and opportunity to depose Maul.

Moreover, this Court should not consider Carmack's forfeited argument that the district court erred in applying the "legitimate business reason" prong of the *McDonnell Douglas* analysis to the Whistleblower Act. The only guidance from the Supreme Court of Virginia is that the common law definition of proximate cause does not apply to statutory wrongful discharge claims, and the Whistleblower Act itself does not delineate how a court should analyze causation. Thus, Carmack cannot meet his heavy burden of showing that the district court committed fundamental error that seriously affected the fairness, integrity or public reputation of the judicial proceedings.

## STANDARD OF REVIEW

This Court reviews a district court's order granting summary judgment *de novo*, viewing the facts and reasonable inferences arising therefrom in the light most favorable to the nonmoving party. *Bonds v. Leavitt*, 629 F.3d 369, 380 (4th Cir. 2011) (internal citation omitted). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be

counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Thus, "it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs" the materiality inquiry. *Id.*

This Court reviews a district court's denial of a motion to strike "for abuse of discretion, and the factual determinations underlying the evidentiary ruling for clear error." *Evans v. Technologies Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996). "Such rulings are "entitled to great deference." *NCO Fin. Sys., Inc. v. Montgomery Park, LLC*, 918 F.3d 388, 396 (4th Cir. 2019).

## ARGUMENT

### I.    The district court properly denied Carmack's motion to strike Michael Maul's second declaration.

A party who fails to provide information required by Fed. R. Civ. P. 26(a) or (e) is "not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or harmless." Fed. R. Civ. P. 37(c)(1). In determining whether an untimely disclosure is substantially justified or harmless, the Fourth Circuit applies the following five factors:

> (1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose.

*S. States Rack & Fixture Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 597 (4th Cir. 2003). Motions to strike are "generally viewed with disfavor 'because striking a portion of a pleading is a drastic remedy and because it is often sought by the movant simply as a dilatory tactic.'" *Waste Mgmt. Holdings v. Gilmore*, 252 F.3d 316, 347 (4th Cir. 2001) (citation omitted).

Carmack essentially argues that the district court abused its discretion because: (1) the second Maul declaration presented new factual matters to dispute Matlock's deposition testimony; (2) Carmack lacked sufficient knowledge of Maul's relevant knowledge to meaningfully depose him; and (3) Carmack had no opportunity to meaningfully depose Maul. Consideration of the whole record and Carmack's own litigation conduct provides sufficient facts to support the district court's ruling.

### A. Maul's second declaration did not present new factual allegations, much less attempt to resolve alleged discrepancies.

Carmack first argues that Appellees submitted the second Maul declaration to cure an alleged discrepancy in Matlock's testimony. Opening Br. at 17-18. Specifically, Carmack alleges that Matlock "strayed from the script that was presented" because he conceded that the budget reduction memos played at most a "small part . . . [a] very small" part. *Id.* at 17 (quoting J.A. 1936). In other words, Carmack contends that Matlock's testimony "gutted" Appellees' defense, and the second Maul declaration presented new factual matters to "smooth over" this

26

testimony.[15] Not so. While it is true that "where affidavits present conflicting versions of the facts which require credibility determinations, summary judgment cannot lie[,]" *Raynor v. Pugh*, 817 F.3d 123, 130 (4th Cir. 2016) (internal quotation marks omitted), no such discrepancy exists in this case.

First, Carmack significantly truncates Matlock's testimony in a way that renders it misleading. Specifically, Carmack claims that "Matlock conceded that the budget reduction *memos* played at most a 'small part . . . [a] very small' part in Matlock decision to terminate Carmack . . . ." Opening Br. at 17 (emphasis added). But a plain reading of the transcript reveals that Matlock was referring only to the August budget reduction memo as playing a "small part" in his decision-making process. J.A. 1936. Matlock immediately stated thereafter that "[i]t was the follow-up email that probably frightened me more than anything, which came later . . . in late September, early October." *Id.* When asked by Carmack's attorney to clarify what he meant, Matlock confirmed that the September budget reduction memo "really triggered my conversations, the two together, but that one was the one that made me realize I needed to look for a more long-term solution. So I sought out the

---

[15] Carmack does not identify any specific statements in the second Maul declaration that "smooth over" these alleged discrepancies.

advice of DPB." J.A. 1944-1945. When read as a whole, that testimony is entirely consistent with Matlock's prior testimony.[16]

Second, the second Maul declaration presented no "new" evidence. Courts in this circuit adhere to the "ordinary rule . . . that an argument raised for the first time in a reply brief or memorandum will not be considered." *Clawson v. FedEx Ground Package Sys., Inc.*, 451 F. Supp. 2d 731, 734 (D. Md. 2006) (citing *United States v. Williams*, 455 F.3d 724, 736 n.6 (4th Cir. 2006)). But a defendant may submit additional evidence and declarations with a reply brief to address issues and facts raised in a plaintiff's opposition to summary judgment. *See Bocock v. Specialized Youth Servs. of Va.*, No. 5:14-cv-00050, 2015 U.S. Dist. LEXIS 144598, at *10 (W.D. Va. Oct. 23, 2015); *Ilozor v. Hampton Univ.*, No. 4:06-cv-90, 2007 U.S. Dist. LEXIS 33032, at *40-42 (E.D. Va. May 3, 2007) *aff'd*, 286 F. App'x 834 (4th Cir. 2008).

Here, Maul's second declaration was cabined to specific allegations contained in Carmack's supplemental opposition brief. For every factual point Maul addressed in his second declaration, he identified precisely the pertinent

---

[16] As the district court correctly observed, "a thorough review of the voluminous record shows Matlock's sworn statements and testimony during this litigation are consistent with pre-litigation documents and with Matlock's representations to others with whom he consulted both within and without the Center." J.A. 2256 (citing J.A. 126-127, 1260, 1944-1945).

arguments in Carmack's supplemental opposition brief to which he was responding. And the matters Maul discussed—specifically, the details surrounding the budget reduction memos and Matlock's response thereto—were addressed in Maul's first declaration. For example, Carmack alleged that Matlock violated state policy by submitting the WTA proposal after Carmack submitted his own savings plan in response to the August budget reduction memo. ECF No. 100 at 8. Maul responded that Matlock could go forward with the WTA in lieu of the prior savings plan if he had approval from DPB. J.A. 2170.

This sworn statement corroborated prior evidence that: (1) any "subsequent budget decisions that will be made[] should be directed to . . . the Department of Planning and Budget," J.A. 2008, 2081; (2) Matlock met with Maul in February 2017 to discuss the WTA proposal, J.A. 168; (3) Maul told Matlock at that time that nothing in Virginia law or policy prevented him from moving forward with the WTA proposal, J.A. 382-383; and (4) DPB ultimately approved the WTA proposal because it was the result of budget reductions enacted in the Appropriations Act, J.A. 393. In other words, Maul's second declaration provided a cogent explanation as to why Matlock honestly believed he could go forward with the WTA proposal. This direct response is a proper use of a reply declaration.[17]

_____

[17] Carmack dismisses Maul's "litigation affidavit" as a "post-hoc rationalization[] used to justify a desired result." Opening Br. at 19 n.10. But the case law cited

**B.    Appellees adequately identified the substance of Maul's anticipated knowledge in their Rule 26(a)(1) disclosure and document production.**

Carmack next argues that the Appellees failed to adequately identify the substance of the second Maul declaration in their discovery responses. Specifically, Carmack contends that had Appellees not withheld the budget reduction memoranda—which Carmack insists contained "the reason [he] was fired"—until after discovery closed, Carmack would have deposed Maul. Opening Br. at 19.

From the outset, it is important to identify precisely what Carmack may challenge on appeal. Carmack filed a motion for discovery sanctions because Appellees did not timely disclose the budget reduction memos, and the district court provided a remedy to correct that error and hold Appellees accountable. Because Carmack has not challenged the adequacy of the remedy the district court provided, he has abandoned any further claim that he was prejudiced by the late

---

cautioning against the use of litigation declarations applies to challenges of federal agency decisions under the Administrative Procedure Act, 5 U.S.C. § 706. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 413 (1971). In that context, the admonition against using declarations makes sense because the determination of whether the agency action was arbitrary and capricious must be made on facts the agency had at the time of the decision, whereas post-hoc declarations are created after the agency had acted. *Dow AgroSciences LLC v. Nat'l Marine Fisheries Serv.*, 707 F.3d 462, 467-68 (4th Cir. 2013). Such rationale is nonexistent in an employment discrimination case. *See* Fed. R. Civ. P 56(c)(1)(A) (permitting the use of "affidavits or declarations" to support a motion for summary judgment).

disclosure. *See Edwards v. City of Goldsboro*, 178 F.3d 231, 241 n.6 (4th Cir. 1999); Fed. R. App. P. 28(a)(9)(A). And Carmack cannot argue that he was improperly denied a request to depose Maul because he never made such a request. Thus, the only issue before this Court is whether Appellees adequately disclosed Maul's identity and the substance of his relevant knowledge.

Parties are required to provide "the name and, if known, the address and telephone number of each individual likely to have discoverable information— along with the subjects of that information—that the disclosing party may use to support its claims or defenses . . . ." Fed. R. Civ. P. 26(a)(1)(A)(i). Crucially, a party is not required to provide an expansive recitation of individual's knowledge, but rather to "[i]ndicat[e] *briefly* the general topics on which such persons have information" to "assist other parties in deciding which depositions will actually be needed." Fed. R. Civ. P. 26 advisory committee's note, 1993 amend. (emphasis added). In sum, a party must "make a reasonable inquiry and . . . provide[ ] [more than] 'a laundry list of undifferentiated witnesses.'" *Guantanamera Cigar Co. v. Corporacion Habanos, S.A.*, 263 F.R.D. 1, 6 (D.D.C. 2009) (quoting *Sender v. Mann*, 225 F.R.D. 645, 651 (D.Colo.2004)).

Here, the district court properly recognized that the information Appellees provided in their initial disclosure and concurrent document productions gave Carmack more than sufficient "context" to make an informed decision about

31

whether to timely depose Maul. J.A. 2186. In the October 26, 2018 Disclosure, Appellees identified Maul as an individual whom Matlock told "that he would be submitting a WTA request later in the year and that the Chief Financial Officer position was one of the positions planned for elimination." J.A. 2140-2141. Appellees reiterated on December 7, 2018 that Maul had knowledge that Matlock was developing a WTA proposal. J.A. 2151. Appellees simultaneously produced documents seeking approval from DPB for the reorganization proposal, J.A. 224, signaling to Carmack that this agency headed by Timberlake had intimate knowledge of the WTA proposal and its underlying justifications.

Nor is there any merit to Carmack's argument that his failure to depose Maul was due to Appellees' failure to disclose the reason for Carmack's lay off until after the close of discovery. Appellees produced several documents that confirmed Matlock's reorganization plan, its underlying justification, and Maul's involvement in that process. The WTA Exemption Request was sent to Timberlake of DPB and proposed eliminating Carmack's position because "of budget reductions enacted in the Appropriation Act." J.A. 207. The Budget Reduction and Restructuring Proposal explained that "[d]ue to budgetary shortfalls in the Commonwealth, the [Center] has experienced budgetary reductions of $108,058.00 (5%) for 2016-2017 and $108,058.00 (5%) for 2017-2018." J.A. 208. Appellees also produced on January 18, 2018, among other documents, an email from Maul confirming the

February 2, 2017 conversation listed in Appellees' Initial Disclosure. J.A. 168. And the DPB approval, also produced on January 18, 2018, specifically stated that Matlock's WTA proposal was "a result of budget reductions enacted in the Appropriation Act." J.A. 393. Although these documents do not specifically reference the August or September budget reduction memos by name, the critical content—the 5% budget reductions for fiscal years 2017 and 2018 respectively, J.A. 146, 150—appear consistently throughout the documents Appellees produced. J.A. 18-19, 154-157, 207-209, 217-221, 340, 363, 387-393, 1809-1812.

The district court's recognition that Carmack had in his possession all of these documents and disclosures two months before discovery closed was not "arbitrary or capricious." *See United States v. Pittman*, 209 F.3d 314, 316 (4th Cir. 2000) (holding that the abuse of discretion "standard of review mandates a significant measure of appellate deference to the judgment calls of trial courts"); *United States v. Mason*, 52 F.3d 1286, 1289 (4th Cir. 1995) ("Under the abuse of discretion standard, this Court may not substitute its judgment for that of the district court[.]"). Under this deferential standard of review, the district court did not abuse its discretion when it found that Appellees' identification of Maul, the description of his knowledge of the case, and the documents produced satisfied the disclosure requirements under Rule 26(a)(1).

## C.     Carmack failed to take advantage of multiple opportunities to depose Maul.

Finally, Carmack argues that "the district court did not permit [him] to depose Maul." Opening Br. at 16. But the record is devoid of any request by Carmack to depose Maul. As discussed above, Carmack knew from Appellees' disclosures that they would rely on Maul's knowledge to support their claims; and the documents Appellees' produced well before the close of discovery signaled to Carmack that Maul had intimate knowledge of the WTA proposal and its underlying justifications. But even if Carmack did not fully appreciate the significance of Maul's role in the WTA process until after receiving the budget reduction memos, he still "did not seek to depose [Maul] or to take any other steps to mitigate the purported surprise caused by [Appellee's] delayed disclosure of the [budget reduction memos]." *Bresler v. Wilmington Trust Co.*, 855 F.3d 178, 194 (4th Cir. 2017). Carmack had fifteen days after Reagan's deposition to seek appropriate relief, but he did not do so. Thus, Carmack "had not only the ability to cure any surprise, but also the opportunity." *Golden Nugget, Inc. v. Chesapeake Bay Fishing Co., L.L.C.*, 93 Fed. Appx. 530, 534 (4th Cir. 2004).

## II.    Carmack forfeited his argument that the district court erred in applying the "legitimate business reason" analysis to the Whistleblower Act.

Carmack argues the district court erred in applying the *McDonnell Douglas* burden-shifting framework to the Whistleblower Act. Opening Br. at 13. Carmack

34

contends that Virginia law required the district court to apply the more lenient "proximate cause" standard, which should have precluded the district court from considering whether Appellees provided a legitimate business reason to justify the elimination of Carmack's position. That argument, however, faces an insurmountable problem: Carmack never made it to the district court.

"[I]ssues raised for the first time on appeal generally will not be considered." *Muth v. United States*, 1 F.3d 246, 250 (4th Cir. 1993). "[A] federal court may exercise its discretion to correct an error not raised below . . . if (1) there is an error; (2) the error is plain; (3) the error affects substantial rights; and (4) the court determines . . . that the error seriously affects the fairness, integrity or public reputation of judicial proceedings." *Owens-Illinois, Inc. v. Rapid Am. Corp. (In re Celotex Corp.)*, 124 F.3d 619, 630-31 (4th Cir. 1997) (citing *United States v. Olano*, 507 U.S. 725, 732 (1993)). The requirements of *Olano* apply "at a minimum" in civil cases. *Id.* at 631.

Carmack's failure to argue in his Opening Brief that this Court should consider his forfeited challenge is fatal because "[f]ailure to present or argue assignments of error in opening appellate briefs constitutes a waiver of those issues." *IGEN Int'l, Inc. v. Roche Diagnostics GmbH*, 335 F.3d 303, 308 (4th Cir. 2003); *see United States v. Lavabit, LLC (In re Under Seal)*, 749 F.3d 276, 292 (4th Cir. 2014) ("Lavabit's failure to argue for plain error and its application on

appeal . . . surely marks the end of the road for [its] argument for reversal not first presented to the district court." (citation omitted) (alteration in original).

### A. The district court did not commit "fundamental error" because no court decision has addressed the evidentiary burden for causation under the Whistleblower Act.

"'Fundamental error' is 'more limited' than the 'plain error' standard that [this Court] appl[ies] in criminal cases." *Lavabit*, 749 F.3d at 285 (quoting *Stewart v. Hall*, 770 F.2d 1267, 1271 (4th Cir. 1985)). "So, when a party in a civil case fails to meet the plain-error standard, . . . he has not established fundamental error." *Id.* at 286. "To be plain, an error must be 'clear' or 'obvious,' at least by the time of appeal." *United States v. Promise*, 255 F.3d 150, 160 (4th Cir. 2001) (citations omitted). "This standard is satisfied when the 'settled law of the Supreme Court or this circuit' establishes that an error has occurred." *United States v. Neal*, 101 F.3d 993, 998 (4th Cir. 1996) (citation omitted).

Carmack concedes, as he must, that the contours of the causation analysis under the Whistleblower Act are not defined by statute or court decisions. Opening Br. at 21. And the cases Carmack cites in his brief define "proximate cause" for common law claims sounding in tort rather than for purposes of the statute under which he is proceeding here. *E.g.*, *Bentley v. Felts*, 445 S.E.2d 131, 132 (Va. 1994) (automobile accident); *S & C Co. v. Horne*, 235 S.E.2d 456, 458 (Va. 1977) (wrongful death suit); *Beale v. Jones*, 171 S.E.2d 851, 852 (Va. 1970) (personal

36

injury suit involving an automobile accident); *Etheridge v. Norfolk S. R. Co*., 129 S.E. 680, 681 (Va. 1925) (personal injury suit involving a train collision).

Of course, "a plaintiff who asserts a cause of action for wrongful termination under *Bowman* . . . is not required to prove that the employer's improper motive was the sole cause of the wrongful termination." *Shaw v. Titan Corp.*, 498 S.E.2d 696, 700 (Va. 1998). But the Supreme Court of Virginia has made clear that "Virginia's common law standard of proximate causation" applied only to "a common law claim of wrongful termination" and was inapplicable to "statutory cause[s] of action." *Id.* (distinguishing a common law *Bowman* claim from a statutory cause of action under Virginia Code § 65.2-308(A)). This Court must therefore look to the statutory language of the Whistleblower Act to determine the appropriate causation standard and thereafter consider whether the district court fundamentally erred in applying *McDonnell Douglas* to that statutory language.

Here, the relevant provision of the Whistleblower Act simply states that "[n]o employer may discharge, threaten, or otherwise discriminate or retaliate against a whistle blower."[18] Va. Code § 2.2-3011(A). The statute does not contain the same "because of" language that *Shaw* relied upon to reject a "sole cause"

---

[18] It is clear that Va. Code § 2.2-3011(A) is the relevant subsection undergirding Count I because Carmack quoted that language in his Amended Complaint. J.A. 90. Carmack further quoted § 2.2-3011(A) in his opposition to Appellees' motion for summary judgment. ECF No. 72 at 12 n.14.

motive under a *Bowman* claim. *Shaw*, 498 S.E.2d at 699. Significantly, the next subsection states that "[n]o employer may discharge, threaten, or otherwise discriminate or retaliate against a while blower *in whole or in part*, because the whistle blower is requested or subpoenaed by an appropriate authority to participate in an investigation, hearing, or inquiry by an appropriate authority or in a court action." Va. Code § 2.2-3011(B) (emphasis added). The General Assembly's inclusion of the phrase "in whole or in part" in the participation subsection but not the antecedent whistleblower subsection suggests that the "sole cause" or "but-for" causation standard is appropriate under Virginia Code § 2.2-3011(A). *See Virginian-Pilot Media Cos., LLC v. Dow Jones & Co*., 698 S.E.2d 900, 902 (Va. 2010) ("The maxim *expressio unius est exclusio alterius* applies when mention of a specific item in a statute implies that omitted items were not intended to be included."); *Halifax Corp. v. First Union Nat'l Bank*, 546 S.E.2d 696, 702 (Va. 2001) ("[W]hen the General Assembly includes specific language in one section of a statute, but omits that language from another section of the statute, we must presume that the exclusion of the language was intentional.").

Moreover, the district court conducted an exhaustive survey of decisions addressing the causation framework for similar state and federal whistleblower statutes and concluded that the burden-shifting framework was amenable to the Whistleblower Act. J.A. 2224 (citing cases). Further, this Court has applied the

"legitimate business reason" prong of the *McDonnell Douglas* test to Virgina Code § 40.1-51.2:1, which similarly states that "[n]o person shall discharge or in any way discriminate against an employee because the employee has filed a safety or health complaint." *Scarborough v. Aegis Communs. Group, Inc.*, No. 99-2671, 2000 U.S. App. LEXIS 14321 at *2 (Jun. 20, 2000). Given "the regularity with which courts apply [the *McDonnell Douglas*] framework in assessing the causation element in cases involving state whistleblower statutes and/or provisions," J.A. 2225, the district court did not commit fundamental error in applying the *McDonnell Douglas* framework to the Whistleblower Act. *See United States v. Alli-Balogun*, 72 F.3d 9, 12 (2d Cir. 1995) (stating that "we do not see how an error can be plain error when the Supreme Court and this court have not spoken on the subject, and the authority in other circuit courts is split").

### B.    Any possible error did not seriously affect the fairness, integrity, or public reputation of the judicial proceedings.

Where the evidence is "'overwhelming and essentially uncontroverted,' there [i]s 'no basis for concluding that the error seriously affected the fairness, integrity or public reputation of judicial proceedings.'" *United States v. Mackins*, 315 F.3d 399, 408 (4th Cir. 2003) (quoting *United States v. Cotton*, 535 U.S. 625, 633 (2002)). This Court must also consider whether Carmack "lacked the opportunity to raise the [forfeited] issue." *Owens-Illinois, Inc.*, 124 F.3d at 631. Consideration of both factors militates against considering Carmack's argument.

39

### 1. Carmack had multiple opportunities to challenge whether the "legitimate business reason" defense applied.

Appellees argued in their motion for summary judgment that Carmack failed to establish causation for Counts I through IV because the undisputed evidence affirmatively established that Carmack's layoff was the result of a year-long process to implement the WTA. ECF No. 64 at 21. Appellees did not differentiate the causation legal standards for the First Amendment claim and the Whistleblower Act claim. Carmack similarly lumped the two claims together in his opposition brief. ECF No. 72 at 10-13. In reply, Appellees argued that Matlock had a legitimate business reason to lay off Carmack, thereby defeating both remaining claims. ECF No. 74 at 11.

At the hearing on Appellees' motion for summary judgment, the district court repeatedly discussed the impact of Appellees' legitimate business reason on the causation analysis. J.A. 1880, 1924. Again, Carmack never argued that the *McDonnell Douglas* analysis did not apply to the Whistleblower Act. Quite the opposite, Carmack himself invoked the legitimate business reason analysis without differentiating between the First Amendment and the Whistleblower Act. J.A. 1909 ("Ms. Haddox: Our first argument is based on the fact that there was no legitimate business interest need for the reduction."). And Carmack again failed to provide any legal argument that the district court should not apply *McDonnell Douglas* to the Whistleblower Act in his supplemental opposition brief.

Carmack had three opportunities to bring to the district court's attention that traditional definition of "proximate cause" governed his Whistleblower Act claim and not the *McDonnell Douglas* burden shifting analysis. His failure to do so compels the conclusion that the fairness, integrity, or public reputation of the judicial proceedings will not be impugned if this Court declines to consider that argument now for the first time on appeal.

2. **Appellees have amassed substantial, overwhelming, and uncontroverted evidence that Matlock's decision to abolish Carmack's position was due to a budget reduction mandate and was not motivated by retaliatory animus.**

Because Carmack did not appeal the district court's grant of summary judgment on his First Amendment claim, he has essentially conceded that Appellees met their burden of demonstrating that Matlock had a legitimate business reason for abolishing Carmack's position as CFO. *See Edwards*, 178 F.3d at 241 n.6; Fed. R. App. P. 28(a)(9)(A). In other words, he concedes that he "has not presented sufficient evidence for a reasonable jury (1) to conclude that his various complaints were a 'substantial' or 'motivating' factor in, let alone a but for cause of his termination, (2) to discredit the underlying justifications for abolishing the CFO position, or (3) to cast doubt on the legitimacy of the WTA process." J.A. 2261. This concession alone provides compelling proof that the district court's dismissal of his Whistleblower Act claim did not impugn the fairness, integrity or public reputation of the judicial proceedings.

41

Notwithstanding Carmack's concession, the district court succinctly summarized a record spanning thousands of pages in conclude that "the record, as a whole, including the parties' arguments, exhibits, and the applicable law, . . . fail[s] to show, by direct or circumstantial evidence, that Matlock's decision to eliminate the CFO position was causally related to his alleged internal warnings and complaints or external complaint to the OSIG." J.A. 2255. The record reflects this observation over Carmack's unsupported speculations.

While Carmack repeatedly characterized Matlock's reasons for abolishing the CFO position as "evolving" and/or "ever-changing," ECF No. 100, at 1-2, contemporaneous documents, deposition testimony, and declarations from knowledgeable, neutral third parties indicate that Matlock's rationale for eliminating Carmack's position was consistently, albeit not always explicitly, predicated upon the mandate announced in the 2016 memoranda. J.A. 154, 207-209. Matlock testified at his first deposition that he began seeking guidance about the WTA after "receiv[ing] correspondence from the Governor's Office about fiscal year '15, fiscal year '16, fiscal year '17, and potentially fiscal year '18 budget reductions." J.A. 1260-1261. In his declaration, Matlock again confirmed that he received two emails requesting budget savings plans for fiscal year 2017 and advising that there could be additional cuts for fiscal year 2018. J.A. 126-127. Finally, Matlock again explained in his second deposition that the September 27,

2016 "reminder" email "really triggered my conversations, the two together, but that one was the one that made me realize I needed to look for a more long-term solution." J.A. 1944-1945.

The record also shows that the WTA process began in October or November 2016, J.A. 154, approximately eleven months before the earliest date (October 16, 2017) on which it is alleged that Matlock became aware that Carmack filed the OSIG complaint, J.A. 1718. To the extent Carmack claims that the WTA process itself contained irregularities, the district court was unpersuaded that any of these alleged irregularities amounted to anything more than "pinprick objections" and/or minor discrepancies that, rather than casting doubt on the validity of Matlock's explanation, merely invited the placement of "routine personnel decisions in judicial hands." *Hux v. City of Newport News*, 451 F.3d 311, 313 (4th Cir. 2006). What is more, the record clearly shows that at nearly every stage of the WTA process, Matlock in fact sought guidance, as he claimed in his second deposition, from "DPB, DHRM, and UVA HR and legal." J.A. 1952. Thus, Carmack produced little evidence reasonably calling into question the honesty of Matlock's belief that abolishing the CFO position was permissible under state policy and in the best long-term interests of the Center. *See DeJarnette v. Corning, Inc*., 133 F.3d 293, 299 (4th Cir. 1998) (holding that the plaintiff "must present evidence reasonably calling into question the honesty of his employer's belief; [an] employee's mere

43

demonstration that his employer's belief may be incorrect is not sufficient to prove discrimination").

As for the various "internal warnings and complaints" predating the OSIG complaint, Carmack has not presented sufficient evidence that Matlock's efforts to advance the workforce organization were associated with any demonstrable knowledge of these complaints or a marked increase in hostility. The "pull the trigger" email occurred on June 1, 2017, J.A. 1734, well before Carmack filed his complaint with OSIG, J.A. 429. Matlock's November 1, 2017 email in which he asked Kauffman if the Center was "ready to go to the next level" included a "Budget Reduction and Restructuring Proposal" that explained the rationale for eliminating the CFO position. J.A. 1691-1694. But this November 1, 2017 Budget Reduction and Restructuring Proposal is remarkably similar to a Budget Reduction and Restructuring Proposal that Matlock forwarded to Kauffman on September 28, 2017, before the alleged October meeting. J.A. 206-209. Because Matlock's rationale for eliminating Carmack's position was consistent before and after he allegedly learned of Carmack's protected speech, no jury could reasonably conclude that Matlock's rationale was motivated by retaliatory animus. *See DeJarnette*, 133 F.3d at 299 (noting that because the decision-maker rendered his first evaluation before he was aware that the plaintiff was pregnant and his other evaluations were consistent with the first evaluation, there was "nothing in the

record to suggest as a reasonable probability . . . that Liggon's knowledge of DeJarnette's pregnancy affected his remaining evaluations in any manner").

Moreover, the district court correctly observed that "the conduct which Carmack asserts to be retaliatory appears to be more the product of clashing personalities (a dynamic that preexisted all of the alleged internal complaints) rather than acts in retaliation for Carmack's holding Matlock's 'feet to the fire with respect to . . . compliance issues.'" J.A. 2257. Indeed, much of the conduct Carmack interpreted as evincing retaliatory animus was explainable without resort to speculative assertions of unlawful retaliation. Carmack, for example, claimed that after Matlock became aware of his OSIG complaint, Matlock "blocked" his emails to SAAG Griffin such that Carmack was not receiving emails Griffin claimed to have sent him. J.A. 728-731. Carmack simply assumed, without any basis, that "Matlock cut off my emails to [her], giving her the impression that I was ignoring her." J.A. 1719. Carmack insinuates that Webb, Matlock, and Tolbert, who "[w]orked against me as a group," conspired together to "block" emails to him from Griffin. J.A. 730-731. Tolbert, responding to a "user support request" from Carmack, investigated the issue and discovered Griffin's missing emails in Carmack's junk mail folder. J.A. 1791. Tolbert later discovered that Griffin's email address was on a "blocked senders" list, and stated that "[o]nly Carmack, or

45

someone he provided his account access credentials," had the capability to add someone to that list. J.A. 1791-1792.

And there is little basis for Carmack's claim that he was "cut off" from communications with DPB. Once budget projects are submitted to DPB, there is little involvement from the agencies because the budget process becomes confidential. J.A. 1767-1768. Carmack was active in submitting Capital Budget Requests. J.A. 1770-1773. Moreover, Carmack communicated with DPB in October and November of 2017. J.A. 1775-1778, 1786.

In sum, a careful examination of the record reveals the extent to which Matlock formulated a budget reduction plan that was thorough, transparent, and meticulous. The elimination of the CFO position was conceived of prior to all of Carmack's alleged complaints, except those related to pre-selection, which did not have any demonstrable impact on Matlock's relationship with Carmack. Thereafter, Matlock requested scrutiny and review from DHRM and DPB. Throughout this process, Matlock documented his steps in meticulous detail. The district court correctly noted that Carmack's arguments reflected mere disagreements with Matlock's decision to reduce the budget by abolishing positions rather than making use of the Center's surplus funds or standing by the original savings plans. The wisdom or correctness of Matlock's decision is not the province of this Court. *See Rowe v. Marley, Co.*, 233 F.3d 825, 831 (4th Cir. 2000)

(holding an employer's decision to discharge one employee over another is the type of decision this court is reluctant to second guess); *Giannopoulos v. Brach & Brock Confections*, 109 F.3d 406, 411 (7th Cir. 1997); *Henson v. Liggett Group, Inc.*, 61 F.3d 270, (4th Cir. 1995).

The "substantial and specific record evidence, including numerous exhibits containing extensive correspondence, supporting [Appellees'] contention that Carmack's CFO position was eliminated as part of a 'long-term solution that would meet Governor Terry McAuliffe's budget mandate' for 2017 and 2018 rather than motivated by retaliatory animus" gives this Court more than enough assurance that the dismissal of Carmack's Whistleblower Act claim did not impugn the fairness, integrity, or public reputation of the judicial proceedings.

## C. Carmack's belated request for certification of this issue to the Supreme Court of Virginia is improper.

Carmack requests that this Court "should certify the question [of causation] to the Supreme Court of Virginia." Opening Br. at 25. Carmack cites only the dissenting opinion in *Passaro v. Virginia*, 935 F.3d 243, 253 (4th Cir. 2019) (Traxler, J., dissenting), as support for this request. Dissenting opinions, however, are not binding. *Puentes Fernandez v. Keisler*, 502 F.3d 337, 350 n.6 (4th Cir. 2007). Carmack has cited no case, and Appellees have found none, that permits a party to salvage a forfeited claim by seeking certification from the state court for the first time on appeal. Carmack consented to the federal court's jurisdiction when

he did not seek remand after Appellees removed the matter to federal court. *Accord*

*Passaro*, 935 F.3d at 252-53; *Nat'l Bank of Washington v. Pearson*, 863 F.2d 322,

327 (4th Cir. 1988) ("If Pearson had wanted the Maryland Court of Appeals to rule

on the matter, he should not have removed the action to federal court."). Carmack

should not be permitted to use state court certification as a means to rescue his

forfeited argument.

## CONCLUSION

The judgment of the district court should be affirmed.

Respectfully submitted,

COMMONWEALTH OF VIRGINIA;
SOUTHWEST VIRGINIA HIGHER
EDUCATION CENTER; DAVID N.
MATLOCK

By:_____/s/_____
     Ryan S. Hardy
     Assistant Attorney General
     Office of the Attorney General
     202 North Ninth Street
     Richmond, Virginia 23219
     (804) 786-0969 – Telephone
     (804) 371-2087 – Facsimile
     RHardy@oag.state.va.us

MARK R. HERRING
    *Attorney General*

SAMUEL T. TOWELL
    *Deputy Attorney General*

E. LEWIS KINCER, JR.
*Senior Assistant Attorney General*

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the requirements of Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in 14-point Times New Roman, a proportionally spaced font, and that it complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B), because it contains 11,048 words, excluding the parts exempted by Rule 32(a)(7)(B)(iii), according to the count of Microsoft Word.

/s/  *Ryan S. Hardy*
Ryan S. Hardy

## CERTIFICATE OF SERVICE

I hereby certify that on March 16, 2020, I electronically filed the foregoing brief with the Clerk of this Court by using the appellate CM/ECF system. The participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

/s/  *Ryan S. Hardy*

Ryan S. Hardy