RECORD NO. 19-2075

In The

# United States Court of Appeals
## For The Fourth Circuit

# WILLIAM D. CARMACK,

*Plaintiff – Appellant,*

**v.**

# COMMONWEALTH OF VIRGINIA; COMMONWEALTH OF VIRGINIA, SOUTHWEST VIRGINIA HIGHER EDUCATION CENTER; DAVID N. MATLOCK, Director of the Southwest Virginia Higher Education Center, in His Individual and Official Capacities,

*Defendants – Appellees.*

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF VIRGINIA AT ABINGDON

―――――――――

## REPLY BRIEF OF APPELLANT

―――――――――

Terry N. Grimes
TERRY N. GRIMES, ESQ., PC
320 Elm Avenue, SW
Roanoke, Virginia 24016
(540) 982-3711

Brittany M. Haddox
STRELKA LAW OFFICE, PC
119 Norfolk Avenue, SW, Suite 330
Roanoke, Virginia 24011
(540) 283-0802

*Counsel for Appellant*          *Counsel for Appellant*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................ ii

ARGUMENT ...............................................................................................1

    I.     The district court applied federal law to a state court claim ...............................................................................................2

    II.    The district court overlooked evidence of causation .................6

         a.     Matlock admitted there was no budget shortfall ..............9

         b.     Matlock admitted that after he fired Carmack, he hired numerous employees and now employs more, not fewer, employees ..................................................... 10

         c.     Carmack was a RIF of one; the other two employees retired in the normal course .......................................... 11

         d.     DHRM did not approve the WTA plan until long after Carmack was terminated ...................................... 13

         e.     The Board was not asked to approve the termination and Board members were upset when they learned after-the-fact that the termination had occurred ........... 14

    III.    The district court refused to strike evidence that the Commonwealth did not disclose during discovery and instead relied upon that evidence to grant summary judgment in contravention of Rule 37...................................... 15

CONCLUSION ........................................................................................... 25

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Carmack v. Virginia*,
    2019 U.S. Dist. LEXIS 58816 (W.D. Va. Apr. 5, 2019) ................... 11

*Evans v. Technologies Applications & Serv. Co.*,
    80 F.3d 954 (4th Cir. 1996) ............................................................... 19

*Furnco Constr. Corp. v. Waters*,
    438 U.S. 567, 57 L. Ed. 2d 957, 98 S. Ct. 2943 (1978) .................... 23

*Gipson v. Vought Aircraft Indus., Inc.*,
    387 Fed. Appx. 548 (6th Cir. 2010) ........................................... 18, 19

*Jordan v. Clay's Rest Home*,
    253 Va. 185, 483 S.E.2d 203 (1997) .....................................................4

*Loney v. Miles*,
    2000 U.S. App. LEXIS 8673 (4th Cir. May 3, 2000) ....................... 19

*McDonnell Douglas v. Green*,
    411 U.S. 792 (1973) ...................................................................... 3, 4, 6

*Passaro v. Virginia*,
    935 F.3d 243 (4th Cir. 2019) ...........................................................2, 6

*Reeves v. Sanderson Plumbing Prods.*,
    530 U.S. 133 (2000) ......................................................................... 23

*Russell v. Absolute Collection Servs., Inc.*,
    763 F.3d 385 (4th Cir. 2014) ............................................................ 19

*Shaw v. Titan Corp.*,
    255 Va. 535 (1998) ...............................................................................4

*St. Mary's Honor Center v. Hicks*,
    509 U.S. 5021(1993) ........................................................... 23

*Wilkins v. Montgomery*,
    751 F.3d 214 (4th Cir. 2014) ............................................. 19

*Yamaha Motor Corp., U.S.A. v. Smit*,
    276 F. Supp. 2d 490 (E.D. Va. 2003) ................................... 2

**STATUTES**

Va. Code. § 2.2, Chapter 30.1 ................................................ 4

Va. Code. § 2.2-3009 ............................................................ 4

Va. Code. § 2.2-3010 ............................................................ 4

Va. Code. § 2.2-3011(A) .................................................... 5, 6

Va. Code. § 2.2-3011(B) ........................................................ 5

Va. Code. § 2.2-3205 ........................................................... 20

Va. Code. § 46.2-1993.67(5) .................................................. 2

Va. Code. § 65.2-308 ......................................................... 4, 6

**RULES**

Fed. R. Civ. P. 26(a) ..................................................... 18, 19

Fed. R. Civ. P. 26(a)(1)(A)(i) ............................................. 18

Fed. R. Civ. P. 26(e) .......................................................... 19

Fed. R. Civ. P. 26(e)(1)(A) ................................................. 19

Fed R. Civ. P. 37 ............................................................... 15

Fed R. Civ. P. 37(c) ............................................................. 2

Fed. R. Civ. P. 37(c)(1) ................................................................ 19

Fed. R. Civ. P. 56(e) ................................................................... 19

**OTHER AUTHORITY**

Virginia Retirement System, https://www.varetire.org/about/index.asp ..... 21

# ARGUMENT

The Commonwealth of Virginia, on brief, spent an extraordinary amount of time discussing alleged facts that not only are contested, but also are superfluous to the issues: the district court (1) applied federal law to a state court claim, and (2) granted summary judgment to the Commonwealth of Virginia after the Commonwealth of Virginia knowingly produced over 2,500 documents to Carmack *after* discovery closed, including the very memoranda that the Commonwealth claimed were the reason it terminated Carmack's employment, which not only reeks of a coverup, the late disclosure had the detrimental effect of preventing Carmack from discovering facts, thus resulting in a summary judgment decision based on litigation affidavits drafted at the eleventh hour by defense counsel, instead of the full record[1] that Carmack would have developed and presented to a jury had the Commonwealth of Virginia not withheld discovery until after discovery closed.   In short, the Commonwealth sandbagged Appellant.

---

[1] And, had this matter proceeded to trial, Carmack would have offered evidence that has developed since the district court granted summary judgment, namely, yet another former Center employee has reported David Matlock to the Office of the State Inspector General's Office for fraudulent activities concerning failing to report income received from fundraisers that he held in the Southwest Virginia Higher Education Center's name. While not properly before this Court for the purpose of deciding whether Carmack met his burden below, this highlights the district court's error of short-circuiting trial in this matter.

Sharp practices such as these are contrary to Fed R. Civ. P. 37(c) and have no place in federal jurisprudence.

## I.    The district court applied federal law to a state court claim.

As the district court noted early on in this case:

> Defendants correctly note that the Supreme Court of Virginia has yet to interpret the Act authoritatively. The court would add that its own survey revealed little in the way of lower state court jurisprudence involving the Act or addressing ambiguities therein which might serve as persuasive authority in this case.

(JA 67).

The district court also noted that where the Supreme Court of Virginia has yet to interpret a statute authoritatively, the question may, of course, be certified to the Supreme Court of Virginia (JA 50). *See also Yamaha Motor Corp., U.S.A. v. Smit*, 276 F. Supp. 2d 490, 493 (E.D. Va. 2003) (certifying questions related to Code of Virginia § 46.2-1993.67(5) to the Supreme Court of Virginia); *Passaro v. Virginia*, 935 F.3d 243, 253 (4th Cir. 2019) (Traxler, J., dissenting) ("If new ground is to be plowed, I believe it should be done by the Supreme Court of Virginia.").[2]

---

[2] The Commonwealth removed the case to federal court (see District Court Dkt. No. 1), thus depriving the Supreme Court of Virginia of the ability to decide the question.

Moreover, the district court also noted that summary judgment, naturally, depends on applying the facts, in the light most favorable to the non-moving party, to the ***correct*** substantive law (JA 2218).

Yet, inexplicably, the district court thereafter changed the rule of law midstream and failed to apply Virginia law to a state law claim, in addition to making statements in its opinion that were simply not true.

For example, the district court stated that "for the first time in this litigation, Carmack contends that his sundry 'internal warnings and complaints' to Matlock, all of which predate his external complaint to the OSIG and occurred sporadically over the course of several years, constitute statutorily protected activity" (JA 2221). This is simply not true. To the contrary, Carmack has relied on these internal complaints from day one (Carmack's Complaint, JA 7-11, ¶6 (listing internal complaints), JA 12, ¶15 (noting under FWA Count that Carmack complained of suspected fraud and abuse to Matlock); Carmack's Amended Complaint, JA 81-85, ¶14 (listing internal complaints), JA 90, ¶40 (noting under FWA Count that Carmack complained of suspected fraud and abuse to Matlock)).

After making this inaccurate assertion, the district court then inexplicably applied the federal *McDonnell-Douglas* burden-shifting standard of proof to determine whether questions of fact existed concerning

3

whether Carmack was discharged, threatened, or otherwise discriminated or retaliated against for being a "whistle blower," as defined in Va. Code. Section 2.2-3010. Yet, Virginia precedent demonstrates that is not likely the standard the Supreme Court of Virginia would apply. *E.g.*, *Jordan v. Clay's Rest Home*, 253 Va. 185, 192, 483 S.E.2d 203, 207 (1997) (rejecting the use of *McDonnell-Douglas* in Virginia wrongful discharge case pursuant to Virginia Code Section 65.2-308); *Shaw v. Titan Corp.*, 255 Va. 535, 544 (1998) (noting that for *Bowman* wrongful discharge cases in Virginia, the standard of proof is "proximate causation," not sole cause, and that the common law of Virginia had not adopted the "mixed motive" causation standard applicable to claims under Title VII).

Moreover, despite Appellee's argument to the contrary, the clear reading of the statute does not support that anything other than Virginia's normal proximate cause standard should apply here. Title 2.2, Chapter 30.1 of the Virginia Code states as follows:

**Section 2.2-3009. Policy**

It shall be the policy of the Commonwealth that citizens of the Commonwealth and employees of governmental agencies be freely able to report instances of wrongdoing or abuse committed by governmental agencies or independent contractors of governmental agencies.

4

**Section 2.2.-3010. Definitions**

....

*"Whistle blower"* means an employee who witnesses or has evidence of wrongdoing or abuse and who makes or demonstrates by clear and convincing evidence that he is about to make a good faith report of, **or testifies or is about to testify to**, the wrongdoing or abuse to one of the employee's superiors, an agent of the employer, or an appropriate authority. "Whistle blower" includes a citizen of the Commonwealth who witnesses or has evidence of wrongdoing or abuse and who makes or demonstrates by clear and convincing evidence that he is about to make a good faith report of, **or testifies or is about to testify to**, the wrongdoing or abuse to an appropriate authority.

...

[Emphasis added]. Thus, the definition of "whistle blower," which applies to both Section 2.2-3011(A) and Section 2.2-3011(B), includes testifying in investigations, hearings, etc. Accordingly, when looking at the difference between Section 2.2-3011(A):

> **A.** No employer may discharge, threaten, or otherwise discriminate or retaliate against a **whistle blower** whether acting on his own or through a person acting on his behalf or under his direction.

[Emphasis added], and Section 2.2-3011(B), it is evident that Subsection B is meant to clarify that even if the whistle blower is requested to participate, rather than taking the action by their own initiative, the whistle blower is still protected:

**B.**     No employer may discharge, threaten, or otherwise discriminate or retaliate against a whistle blower, in whole or in part, because the whistle blower **is requested or subpoenaed by an appropriate authority to participate in an investigation, hearing, or inquiry by an appropriate authority or in a court action**.

[Emphasis added].

Subsection A does not provide a specific standard of proof, like sole cause provided in Virginia Code Section 65.2-308 ("No employer or person shall discharge an employee solely because the employee intends to file or has filed a [worker's compensation] claim."). Thus, again, the standard proof for causation in Virginia, proximate cause, should have been applied in this situation. And, to the extent a question remained about this point due to the lack of Virginia authority on the question, the question should have been certified to the Supreme Court of Virginia. Simply put, if new law is to be made in this novel case with respect to the state law claim, as Judge Traxler said in *Passaro*, it should be made by the Supreme Court of Virginia. The district court's application of the federal *McDonnell-Douglas* standard was, therefore, reversible error.

## II.     The district court overlooked evidence of causation.

Continuing, the evidence was more than sufficient to submit the question of causation to the jury:

- November 2015: Carmack reminded Matlock that he would not deviate from Commonwealth Accounting Policies and Procedures; Matlock immediately responded that he uses the bird "needling" technique to get rid of employees that he does not want (JA 639)

- December 2015: Brooks told Matlock she planned to retire; Matlock moved Tolbert into HR to train to replace Brooks; Carmack complained to Matlock that he violated policy by pre-selecting Tolbert (JA 649-652; JA 1289)

- January 2016: Carmack tried to meet with Matlock to discuss the budget process for the next fiscal year; Matlock, though, was not interested — instead, he said he would contact Chris Fields; Fields had not worked for the Center in 4 years (JA 649)

- January 2016: Matlock started working on process to find another volunteer (Janet Williams) to make the WTA look legitimate

- December 1, 2016: Carmack complains to Matlock about suspected fraud and abuse concerning the overpayment to the Tates (JA 649, 668-673, 679; JA 81; JA 1718)

- December 7, 2016: Matlock told Carmack that he did not want the Tates to report to him (even though they were supposed to have "worked" for Carmack), that he did not want Carmack to "approve" their timesheets, and that Carmack should back off (JA 1718)

- Matlock's fraud, waste, and abuse continues to grow, and Carmack's complaints to Matlock continue (JA 661-662)[3]

_____

[3] *E.g.*, Joe Mitchell hired in violation of policy (JA 695-698; *see also* JA 1002-1003, JA 1065-1068); removal of $9,900 mobile (JA 684-688; JA 1081-1082; JA 846-847; JA 1226-1228; JA 905 ("No. I guess I can't lie. I think that some people didn't care for it, and they took it down")); Matlock failed to submit timely invoices (JA 666-667); Matlock paid for his son's school, and only his son's school, to attend a robotics competition with Center money (JA 690-694; JA 1346); Matlock had disputes with the Community College, his former employer, about the Richard Leigh Songwriter Festival, and after this occurred, a portion of the proceeds from the fundraiser went missing (JA 679-680); six months later, Matlock tried to

- February 2017: Carmack complained to ombudsman at UVA (JA 657, 662)

- The next morning: Carmack met with DHRM (JA 657-658)

- June 2017: Carmack filed OSIG complaint (JA 657; JA 1547-1678 (OSIG file))[4]

- October 16, 2017: Matlock notified of OSIG complaint, gets angry and holds a meeting without Carmack (JA 1718, *see also* JA 1083-1084 (Brooks admitted she suspected it was Carmack who made the OSIG complaint); JA 1320-1321 (Matlock admits he had "suspicions" the whistle blower was Carmack when the inspector called him)).[5]

---

host his own Richard Leigh festival, and those proceeds never showed up at all (JA 680; JA 841-842); and, Matlock held a golf tournament fundraiser, which Matlock planned without the involvement of the finance department, and funds again went missing and the Center was never able to balance the income and expenses for the event (JA 683, 685-686; JA 836-840; JA 1546).

[4] While the Commonwealth of Virginia argued on brief that none of Carmack's reports to OSIG were allegations of fraud, waste, and abuse, that simply is not true — OSIG only investigated reports that it felt would constitute fraud, waste, or abuse if substantiated, and as stated, OSIG substantiated in whole and in part several of Carmack's reports.

[5] Carmack was excluded from OSIG related meetings, "[i]f we were meeting on the OSIG investigation, I don't think he [Carmack] was ever present in any of those meetings" (JA 1084-1085). And, it was clear that Carmack was regarded negatively due to his complaint,

> Q   Did you think that Duffy was trying to cause trouble?
> A   Yes.
> Q   When did you purpose in your mind that Duffy was trying to cause trouble?
> A   With the OSIG investigation. And I was brought in and informed of it by David because my name came up.
> Q   And you thought, based upon that, that it was Duffy trying to cause trouble, correct?
> A   Based on the insinuations that were being levied.

(JA 1087 (*see also id.* (Brooks admitting that the allegation involving her, though, was true)).

- October 2017-on: Carmack no longer included in management meetings (JA 1719)

- October 2017: Carmack's emails to Elizabeth Griffin blocked (JA 728-731)

- October 2017: Carmack cut off from the Virginia Department of Planning and Budget (JA 734-735)

- November 1, 2017: Matlock asked HR if they were ready to go to the next level to eliminate Carmack (JA 1691)

- November 8, 2017: OSIG investigator informally sent Matlock his findings (JA 1685-1690)

- December 7, 2017: Carmack wrote a letter to the Board of Trustees again attempting to bring to light and correct Matlock's misdeeds (JA 751-753; JA 1500-1501)

- December 14, 2017: Board Member Steve Cochran tried to go into Executive Session to discuss Carmack's December 7, 2017 letter, but it was stopped (JA 754-759)

- December 14, 2017: Matlock boasted about how much the revenue of the Center was up and that there were 6 positions being advertised at the Center (JA 1466, 1467-1468)

- January 4, 2018: Matlock fired Carmack due to an alleged budget shortfall and need to reduce positions (JA 18-19; JA 732); the staff was detained in a room for two hours (JA 832) and an armed guard walked Carmack out (JA 1371)

### a.    **Matlock admitted there was no budget shortfall**.

Matlock admitted in his Answer that there was no budget shortfall:

### Amended Complaint

37.    There was no budget shortfall at the time Carmack's employment was terminated as claimed by Matlock.  In fact, there was an excess of $700,000 in Non-General Fund Revenue available to cover staff salaries in the event of an unexpected budget reduction.

(JA 90, ¶37).

### Answer to Amended Complaint

37.    Admitted.

(JA 115, ¶37).  Therefore, any alleged budget shortfall could not have served as the reason to terminate Carmack's employment.

**b.    Matlock admitted that after he fired Carmack, he hired numerous employees and now employs more, not fewer, employees.**

Matlock admitted that after he fired Carmack, he hired numerous employees (JA 1373), and now employs more, not fewer, employees; the Center had 42 employees in December 31, 2017 right before Carmack was fired (JA 1419-1430); the Center had 48 employees (an increase of 14%) 6 months later in June 30, 2018 (JA 1431-1442).[6]

---

[6] While the district court noted this fact early on in this case, it overlooked it when deciding summary judgment:

> Following at least one of the above-referenced retirements, Matlock allegedly filled a position that had been "frozen" for four years with the daughter of his administrative assistant, Kathy Heitala. *Id.* at 12. This was done despite the alleged budgetary shortfall and the fact that Carmack was qualified for

### c.   **Carmack was a RIF of one; the other two employees retired in the normal course.**

Matlock grouped two retirees into Carmack's termination to make it look valid.[7] Only Carmack was kept in the dark (JA 1733; JA 1764-1765 (asking whether Carmack had been told yet)).  In fact, Brooks asked Tolbert to reach out to UVA for her because she did not want UVA to know she knew about it as she did not think it would be "good" (JA 1737).

And, Matlock only spoke of "pulling the trigger" — a telling metaphor — with respect to Carmack, not Brooks nor Williams, in his

---

this position. This latter fact is relevant because per the terms of Virginia's Workforce Transition Act of 1995, which was advanced as the justification for Carmack's termination, a state agency in the executive branch, prior to involuntarily separating an employee, must "make every effort to place the employee in any vacant position within the agency for which the employee is qualified." § 2.2-3201.

*Carmack v. Virginia*, 2019 U.S. Dist. LEXIS 58816, at *26-27 (W.D. Va. Apr. 5, 2019).  And, thus, also notably here, the termination was not a "layoff" under the Workforce Transition Act because Carmack was never offered another position, and to this day has not been called back to work, despite the fact that numerous positions have been available.

[7] JA 1294-1295; JA 1318 (Williams was made aware that the WTA was an option); JA 887-898, 900 (Matlock told Williams about the WTA and told her that she would get credit for an additional 4 years of service and additional retirement; Williams filled out retirement paperwork in August 2017 and never got answers about the status of the paperwork when she followed up thereafter; and, Williams signed all her retirement paperwork before she left); JA 1004-1005 (Brooks told Fields she wanted to retire); JA 1028 (Williams told Brooks she wanted to retire in summer 2017); JA 1736 (Brooks notified Matlock in May 2017 that Williams was interested in WTA, too).

communications concerning the WTA (JA 1734: "I also plan to share with my executive committee of the board before I pull the trigger on Duffy"). In fact, as Alicia Young testified, she feared retaliation as she knew Brooks and Williams had planned to retire, but Carmack had not,

> Q    Okay.  Did you talk with Mr. Carmack after he left employment here?
> A    I've seen him at the Barter at an event.
>
> Q    At what?
> A    At the Barter Theatre I did see him at an event, but, no, since his position was eliminated, I was kind of scared to be in contact with him.
> Q    What do you mean?
> A    I didn't know about retaliation since he was my boss, if my position was in jeopardy.  I had some health issues because of being concerned over that after he left.
> Q    What was your concern?
> A    I was fearful of losing my job if he could lose his job, you know, because I didn't know why he was let go.
> Q    Right.  There were some other people let go too, weren't there, at the same time?
> A    Yes.  They were talking about retiring and he wasn't.
> Q    Well, they were talking about retiring for two or three years before this, correct?
> A    Joyce Brooks was for several years.  Janet for a few months before, I think.

(JA 859-860).  Moreover, Williams did not even understand at deposition that Carmack had been forced out the door as she and Brooks had not been:

> A    I was very surprised that Duffy left that day, I can tell you that.
> Q    Left which day?

A    The day that we retired, I was really surprised because you
made some crack to me one time about you weren't going to
retire for six years or something.
Q    Mr. Carmack told you that?
A    Yeah.

(JA 925-926).

And, significantly, both Williams and Brooks were replaced.[8]

Tellingly, Matlock offered at deposition that Williams' job was ***not***

eliminated:

Q    How long after Williams had her job eliminated did she
retire?
A    Mrs. Williams' job was not eliminated; she was laid off.

(JA 1317).

Thus, a jury may find that Matlock used the WTA as a convenient

cover to mask his effort to "pull the trigger" on Carmack and thereby get rid

of a whistle blower. This is precisely what the Virginia Whistle Blower

Protection Act is designed to prevent.

### d.    DHRM did not approve the WTA plan until long after Carmack was terminated.

Moreover, the Commonwealth of Virginia, on brief, glosses over the

fact that DHRM did not approve the WTA plan until long after Carmack was

---

[8] Adam Tolbert replaced Brooks in HR (JA 649-652; JA 1289). Hannah
Heitala Director of Conference Services, replaced Williams (JA 947; JA
877, JA 902; JA 1056; JA 1295 (Heitala's pay now paid for by the Center);
JA 1378 ("That's a position that involved a lot of Mrs. Williams' duties.")).

gone because Matlock had asked for volunteers, with the exception of

Carmack, which violated state policy (JA 1742, "I'm completely confused

and ready to be committed!!!").  As Matlock testified,

> Q    "A long story, but they tell me asking for volunteers
> completely violates State policy"?
>                          …
> Q    What did the rewrite with DHRM consistent of?
> A    I don't -- I'd have to -- I don't know.
> Q    Was it to omit from the report that the employees except
> Carmack had been told about the layoff?
> A    It could have, but we didn't -- we could, we could have.
> Q    DHRM did not give the final approval until almost mid
> 2018; correct?
> A    They didn't give approval to the execution plan.
> Q    Until mid 2018; correct?
>                          …
> Q    This was long after Carmack had already been let go;
> correct?
> A    That's correct.

(JA 1301-1302).

### e.    The Board was not asked to approve the termination and Board members were upset when they learned after-the-fact that the termination had occurred.

The Board was not consulted prior to terminating Carmack's

employment.  And, when the Board learned, members drew very legitimate

concerns to the table: Carmack's job was essential, *i.e.*, it could not be

eliminated, and the termination gave Carmack grounds for a retaliation suit:

David,
I have almost no connectivity where I am (in the mountains of Pennsylvania), thus my response is brief and will hopefully go through.
I do have concerns with the below.
Each meeting I have attended and at points in-between you report the finances as being good – that the center's revenue is up and costs are down. You also reported being understaffed by positions at the last two board meetings. The $108,058 mentioned below is less than the total salaries will be – likely much less when benefits are included so the number of people and positions is odd to me. The positions of two people are as the leads of those groups, it seems those positions are essential to the center's business and am unclear how those positions are the ones to eliminate.

Happy to discuss more, I am back in town next Monday.

Respectfully,
Cheryl

(JA 1712).

**From:** Steven Cochran [scochran@hhhunt.com]
**Sent:** Thursday, January 4, 2018 11:24 AM
**To:** Griffin, Elizabeth M.
**Cc:** Senator Bill Carrico; David Matlock; Herring, Mark R.; dietra.trent@governor.virginia.gov
**Subject:** FW: HEC Update to Board Members

As a member of the Board and a Human Resources professional, I am very concerned this action will give Mr. Carmack grounds to file a charge of retaliation in response to him raising concerns about the working conditions at the Center.

Have Mr. Matlock and/or Chairman Carrico discussed this action with you?

Your prompt response would be appreciated.

(JA 1710).

### III. The district court refused to strike evidence that the Commonwealth did not disclose during discovery and instead relied upon that evidence to grant summary judgment in contravention of Rule 37.

The Commonwealth of Virginia did not produce the memoranda that it now claims were the reason it terminated Carmack's employment until *after* discovery closed, in a document dump of over 2,500 documents,[9] thus depriving Appellant of opportunity to conduct discovery with respect to the new evidence. The memoranda purport on their face to have been sent to the applicable agencies by Paul Reagan (JA 145, 149). There is no mention of Michael Maul as the source of the memoranda on the face of the records.

---

[9] The Commonwealth of Virginia produced discovery 14 times during discovery, in addition to all of the depositions that were taken, and admitted that the documents were responsive to Carmack's initial discovery requests, yet still withheld the documents until after discovery closed.

Moreover, the only way in which Michael Maul was identified by the Commonwealth of Virginia in their disclosures in discovery was as follows, "6. Michael Maul, Dan Timberlake, Department of Planning and Budget (DPB), on matters described in the Matlock disclosure." In Matlock's disclosure, referenced in Maul's disclosure, however, the memoranda are not mentioned, nor is the fact that Maul was the creator of the alleged reason that Carmack's job was being eliminated. Instead, Maul was mentioned in only one sentence, in a 15-sentence paragraph, and the disclosure only discussed Maul being notified of the WTA; the disclosure did not state that Maul was involved in the creation of the alleged reason the termination from employment occurred, "On February 2, 2017, Matlock met with Michael Maul at the Department of Planning and Budget ("DPB") to inform him that he would be submitting a WTA request later in the year and that the Chief Financial Officer position was one of the positions planned for elimination." And, the first declaration submitted by Maul, with the Commonwealth of Virginia's motion for summary judgment, only discussed Maul's dealings with Matlock related to the WTA: again, not once did Maul mention the memoranda or that he was the source of the memoranda (JA 382-384). Thus, when Carmack first moved for sanctions related to the late disclosure, Carmack had no idea that Maul was involved with the memoranda nor that

he needed any discovery from Maul concerning the memoranda; and, there was no reason to move to strike Maul's first declaration as it was fairly consistent with the disclosure of his involvement in the WTA process: Matlock told him he was going to be using the WTA. Carmack did ask that the Commonwealth of Virginia not be permitted to use any information related to the memoranda on summary judgment as a sanction (District Court Dkt. No. 79, at Page 2). Thus, that request would have covered any information related to Maul's involvement with the memoranda; although, again, Carmack had no knowledge at the time that Maul was involved with the memoranda. Therefore, at that time, when the Court ruled on the original motion for sanctions related to the late disclosure of the memoranda and Matlock's reliance on those documents in his litigation affidavit, the Court permitted Carmack to reopen Matlock's deposition to question him about the memoranda, and to depose Paul Reagan, who Carmack, and the Court at the time, thought was the author of the memoranda (District Court Dkt. No. 79, at Pages 6-7). Moreover, the Court ruled that both parties were permitted to file supplemental briefs based on these additional depositions (District Court Dkt. No. 79, at Page 7).

Then, the Commonwealth of Virginia included in its supplemental brief that was, oddly, awarded as part of a sanction against the

17

Commonwealth of Virginia, a *new* declaration from Michael Maul, which of course Carmack had no opportunity to explore, in which Maul analyzed the memoranda and their effect on the WTA (JA 2169-2172). Thus, Carmack moved to strike this new evidence that he had no opportunity to explore during discovery, because Carmack did not know of Maul's involvement with respect to the memoranda (JA 2173-2177). The district court denied the motion to strike stating that the Commonwealth of Virginia was permitted to respond to Carmack's allegations in an affidavit (JA 2179). What the district court ignored was that Maul was not timely disclosed to have had this knowledge during discovery to give Carmack the opportunity to explore the evidence, permitting the Commonwealth of Virginia to submit a defense attorney drafted declaration instead.

Under Rule 26(a), "a party must, without awaiting a discovery request, provide to the other parties… the name … of each individual likely to have discoverable information – **along with the subjects of that information** – that the disclosing party may use to support its claims or defenses…" *Gipson v. Vought Aircraft Indus., Inc.*, 387 F. App'x 548, 554 (6th Cir. 2010) (citing Fed. R. Civ. P. 26(a)(1)(A)(i)) (emphasis in original). As explained by this Court, the purpose of Rule 26(a) is to allow the parties to adequately prepare their cases for trial and to avoid unfair surprise. *See*

*Wilkins v. Montgomery*, 751 F.3d 214, 221 (4th Cir. 2014).  Under Rule 26(e), a party who has made a Rule 26(a) disclosure or responded to discovery must provide timely supplementation "if the party learns that in some material respect the disclosure or response is *incomplete* or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." Fed. R. Civ. P. 26(e)(1)(A). *Russell v. Absolute Collection Servs., Inc.*, 763 F.3d 385, 396 (4th Cir. 2014) (emphasis added).  And, "[i]f a party fails to provide information ... as required by Rule 26(a) or (e), the party is not allowed to use that information ... to supply evidence." *Gipson v. Vought Aircraft Indus., Inc.*, 387 Fed. Appx. 548, 554 (6th Cir. 2010) (quoting Fed. R. Civ. P. 37(c)(1)) (emphasis added).  And, "[a]ffidavits submitted at summary judgment must 'set forth such facts as would be admissible in evidence.'" *Loney v. Miles*, 2000 U.S. App. LEXIS 8673, at *8 (4th Cir. May 3, 2000) (quoting Fed. R. Civ. P. 56(e)) (citing *Evans v. Technologies Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996)).  Thus, since the evidence should not have been admissible at trial, it likewise should not have been admissible and considered with respect to summary judgment.

Stating further, the discovery deficiencies did not end with the Maul declaration.  After Matlock submitted his affidavit to the Court in April 2019

19

with the Commonwealth's motion for summary judgment (JA 123-381),

Carmack realized that the Commonwealth had withheld attachments to

emails produced by the Commonwealth of Virginia in their document dump

in March 2019. Finally, on May 31, 2019, long after discovery closed and

after Carmack requested the attachments, the Commonwealth of Virginia

produced to Carmack the attachments that revealed that the 5% reduction

mentioned in the memoranda was resolved long before Matlock made efforts

to eliminate Carmack.[10] Continuing, the memoranda's goal was to save State

funds. Thus, as stated in both memoranda, a critical part of getting approval

by the Governor was that the savings plan could not shift expenses to

another agency as that simply would not help the goal (JA 147, 150). And,

that is precisely why Matlock never submitted eliminating Carmack in

response to the Governor's memoranda — it never would have been

approved as it saved the Commonwealth nothing.[11]    Moreover, as Paul

---

[10] JA 1998-2006 (submission that was approved); JA 1939-1940 (Secretary of Education Dietra Trent also received copy of the savings plan and had no questions or concerns with it); JA 1936-1938 (Matlock conceding that the approved plan did not terminate Carmack's employment).

[11] Any employee effected by the Workforce Transition Act has two options: take a severance package, which is paid by the Agency that engaged in the WTA (Virginia Code §2.2-3205), or retire and extra years of service are purchased for the employee, which is paid by the Agency unless the Department of Planning and Budget approves it, then the Virginia Retirement System pays. There is no way to know what an employee will select until they are eliminated. And, in either event, the extra funds are

20

Reagan testified, the budget cuts expected by his memoranda required approval by the Governor's office (JA 2079), which Matlock admitted he did not obtain here (JA 1952), and once approved, the changes were recorded by the legislature in the state budget (JA 2083); yet, that also was not done here (JA 1952). In fact, Paul Reagan, who reviewed the budget savings submissions, had no idea Matlock was trying to justify the termination of Carmack's employment in 2018 based on his 2016 memoranda (JA 2045). Moreover, the submissions for the Governor were due on October 31, 2016 (JA 2023) — six months before May 2017 when Matlock, by his own affidavit, claims he decided he wanted to go forward with the WTA (JA 130-131).

---

coming out of the States' pocket. As Paul Reagan testified, the Virginia Retirement System is "a state agency" (JA 2082-2083; *see also* https://www.varetire.org/about/index.asp). Matlock, in fact, admitted at his first deposition, before he knew he wanted to use the Governor's memoranda as his alibi, that the WTA merely shifts costs to another State agency,

> Q    Even if VRS covered that extra retirement, that was still additional expense to the State; correct?
> A    It was additional expense to the Center, yes, which is the State -- it was to the State, not the Center.

(JA 1320). Matlock, forever struggling to keep his story straight, also testified at his second deposition that it was not one of his main goals for the Center not to end up being responsible for the extra retirement funds (JA 1943, lines 19-22). Yet, that was a clear focus of Matlock's brief in support of his motion for summary judgment (*E.g.*, District Court Dkt. No. 64, Pages 6-7).

Moreover, there never was a FY 18 5% reduction (JA 1951-1952). And, in fact, even when there was a potential for a 5% reduction for FY18, a budget was submitted, and approved, for the Center for FY18 that complied with that anticipated budget reduction, that again did not include eliminating Carmack (JA 1957-1958). Thus, any "issue" raised by the Governor's memoranda was resolved before Matlock eliminated Duffy Carmack.

And tellingly, Matlock was not aware of any agency CFO in the history of the Commonwealth who has been laid off as a result of the Workforce Transition Act,

> Q    Do you know of any other Higher Ed. Center in Virginia that has used the Work Force Transaction Act to eliminate a CFO's job?
> A    No.
> Q    In the history of the Commonwealth of Virginia with respect to any agency in the State, are you aware of any other agency that has used the Work Force Transition Act to eliminate a CFO's job?
> A    No.

(JA 1313).

And, lest there be any doubt that the Reagan memoranda served merely as a smokescreen to cover his discriminatory *animus*, at his second deposition — when the AG's office lost control of his words — Matlock backed away from the memoranda and his own litigation affidavit and stated plainly that the budget reduction memos played *at most* a "*small part* … [a]

*very small*" part in Matlock's decision to terminate Carmack (JA 1936) [Emphasis added].   Thus, with one sentence, Matlock eviscerated the Commonwealth's defense to this action and exposed its dissembling.

The law concerning this point is clear.   In *Reeves v. Sanderson Plumbing Prods*., 530 U.S. 133 (2000), the Supreme Court stated that "it is *permissible* for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation" [Emphasis in original],

> The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will *permit* the trier of fact to infer the ultimate fact of intentional discrimination.

*Id.* at 146 (quoting *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 511 (1993)).   Continuing, the Supreme Court stated that proof that the employer's explanation is unworthy of credence may be "quite persuasive." *Id.*   "Moreover, once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision." *Id.* (citing *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577, 57 L. Ed. 2d 957, 98 S. Ct. 2943 (1978) ("When all legitimate reasons for rejecting an applicant have been eliminated as possible reasons

23

for the employer's actions, it is more likely than not the employer, who we generally assume acts with *some* reason, based his decision on an impermissible consideration")).

This same rule of law should have been applied to the case at bar, and for these additional reasons, summary judgment should have been denied.

In conclusion, Matlock's post-discovery created reason for firing Carmack, which should have been struck by the district court, also reeks of a cover-up:

(1) Matlock never produced the memoranda until after discovery closed;

(2) The budget reduction mandate for FY17 was resolved long before the Workforce Transition Act was considered;

(3) There never was a second budget reduction, and even if there had been, the Center's budget for FY18 complied with all anticipated budget reductions and was submitted and approved long before Carmack lost his job;

(4) Matlock complied with none of the steps that were required by the Governor's memoranda — because he was not eliminating Carmack because of the memoranda; and,

(5) Eliminating Carmack would not have helped and/or met the State's goal: to save State funds, not individual State agency funds.

## CONCLUSION

For the foregoing reasons, and the reasons stated in Carmack's opening brief, Carmack requests that this Court reverse the judgment of the district court and remand the case for further proceedings.

Respectfully Submitted,

WILLIAM D. CARMACK

By   /s/ *Brittany M. Haddox*   _
                    Of Counsel

Brittany M. Haddox, Esq. (VSB No. 86416)
STRELKA LAW OFFICE, PC
119 Norfolk Avenue, SW
Warehouse Row, Suite 330
Roanoke, Virginia 24011
(540) 283-0802
brittany@strelkalaw.com
     *Counsel for Plaintiff-Appellant*

Terry N. Grimes, Esq. (VSB No. 24127)
TERRY N. GRIMES, ESQ., P.C.
320 Elm Avenue, S.W.
Roanoke, Virginia 24016
TELEPHONE: (540) 982-3711
FACSIMILE: (540) 345-6572
tgrimes@terryngrimes.com
     *Counsel for Plaintiff-Appellant*

## CERTIFICATE OF COMPLIANCE

1.     This brief complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

[ X ] this brief contains [*5,690*] words.

[    ] this brief uses a monospaced type and contains [*state the number of*] lines of text.

2.     This brief complies with the typeface and type style requirements because:

[ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 2016*] in [*14pt Times New Roman*]; *or*

[    ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].

Dated:  <u>April 2, 2020</u>                        <u>/s/ Brittany M. Haddox</u>
                                                              *Counsel for Appellant*

**CERTIFICATE OF FILING AND SERVICE**

I hereby certify that on this 2nd day of April, 2020, I caused this Reply Brief of Appellant to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

Ryan S. Hardy
Edwin L. Kincer, Jr.
OFFICE OF THE ATTORNEY GENERAL
202 North Ninth Street
Richmond, Virginia  23219
(804) 786-0969

*Counsel for Appellees*

/s/ Brittany M. Haddox
*Counsel for Appellant*